**S. W. NEIGHBORHOOD ASSEMBLY et al., Plaintiffs,**

v.

**Jack ECKARD et al., Defendants.**

**Civ. A. No. 75–1073.**

United States District Court, District of Columbia.

Jan. 23, 1978.

Frederick L. Miller, Jr., Duncan, Brown, Weinberg & Palmer, P.C., Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Dennis Dutterer, Asst. U. S. Attys., Washington, D. C., for defendants.

## AMENDED OPINION

OBERDORFER, District Judge.

This case is about a nine-story office building at 1900 Half Street, S. W., in an area known as Buzzard's Point, an industrial/residential neighborhood on the Anacostia River in Southwest Washington. The case is in Court on a complaint of citizens and citizens' organizations in Southwest against Government Services Administration ("GSA"). The building was built to GSA specifications by a private owner. Before it was built, GSA leased it for five years for use by as many as 2,300 government employees to be assigned there from offices elsewhere. The citizens contend, citing the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, that GSA should have prepared an environmental impact statement before it agreed to the lease because the lease and occupancy of the building will have a significant impact upon traffic, air quality and other elements of the relevant environment. The citizens also complain that GSA failed to honor Executive Order 11512 which requires GSA to be a "positive economic and social influence" in areas where it acquires space, to act consistently with local plans and programs, and to "foster" the policies and programs of the federal government.

The Court now has before it two motions for summary judgment with supporting memoranda: one filed by the citizens, and one by GSA. The parties have also submitted a Joint Statement of Material Facts and environmental assessments prepared by GSA staff about Buzzard's Point (incorporated herein by reference as the source of the facts here stated).[1] On the basis of these documents and with the benefit of oral argument by counsel for both parties, the Court will, for reasons stated more fully below, grant the citizens' motion, deny the GSA motion and enter an order which will (1) require GSA to prepare an environmental impact statement and (2) afford the citizens a later opportunity to seek whatever relief from the Court they believe to be indicated by the statement and by the situation at Buzzard's Point when the statement is complete.

## I. *Facts*

The circumstances about which the citizens complain have their genesis in plans

---

1. GSA prepared several environmental assessments of the Buzzard's Point site. Only one was completed prior to GSA's acquisition of the lease in question. Subsequent assessments relied heavily upon the first and did not materially change it.

begun by GSA in the early 1970's. At that time the Securities and Exchange Commission (SEC) determined that its space was inadequate and requested GSA to relocate SEC or provide additional space near its existing headquarters. In October 1974, the relevant Congressional Committee authorized GSA to acquire for SEC use 460,-000 square feet of space at an estimated annual cost of $2,800,000. In November 1974, GSA advertised its intention to lease office space for use by SEC in the Washington area. In December 1974, GSA issued a formal Solicitation for space to be available by July 1975 for a term of five years. The Solicitation contained precise specifications reflecting SEC's particular requirements.

None of the offers received in response to the Solicitation met all of the essential requirements of location, cost and July 1975 availability. Some offers involved proposed buildings, which, when and if constructed, would be large enough to house the entire SEC according to the specifications at a rental within GSA's means as prescribed by Congress. These offers seemed relatively the most promising. GSA therefore extended the delivery date in the Solicitation to July 1976, and commenced direct negotiation with two offerors of prospective buildings which would meet the size and price requirements. In April 1975, GSA requested these two offerors to submit evidence of a financing commitment, ownership of the offered site for the term of the proposed lease, an executed construction contract with a firm completion date, a building permit and compliance with zoning laws. Both of the bidders responded.

Dr. Lazlo Tauber, a principal of one of these bidders, Southwest Joint Venture (SJV), had originally responded to GSA's December Solicitation without success. On February 14, 1975, Dr. Tauber and SJV again responded to the GSA Solicitation by offering a building which SJV would build to the GSA–SEC specifications in time for July 1976 occupancy. On February 21, 1975, SJV entered into a contract for the construction of such a building. On March 12, 1975, SJV obtained a commitment for interim or construction financing upon the condition that it first obtain a firm building lease commitment from a responsible tenant approved by the lender.[2]

On June 3, 1975, having requested all offerors to submit their best offers by May 30, 1975, GSA accepted the SJV offer. Although SJV had performed a minor amount of excavation on the site prior to June 3, it had not obtained permanent financing as of that date. In fact, neither construction nor permanent financing could have been obtained without a firm lease commitment from some responsible tenant for the building;[3] the lending institutions had conditioned the commitments by retention of the right in the lender to approve the specific tenant, which approval right was exercised here.

Soon after GSA accepted the SJV lease, GSA notified SEC that the building had been assigned to it. SEC immediately protested this assignment to the Office of Management and Budget ("OMB") on the ground that GSA actions in leasing the space violated Executive Order 11512. On January 3, 1976, OMB upheld SEC's appeal and overruled GSA's assignment of SEC to the building. Thereafter GSA negotiated with the Agency for International Development, the Federal Energy Agency and the Departments of Treasury and Agriculture about assignment to Buzzard's Point, but none of these agencies was assigned there.

**2.** In response to GSA's direct communication of April 1975, SJV submitted a copy of its interim financing commitment, deeds of title to the site, an architect's certificate of zoning compliance, a commitment from the contractor to complete the building in time for June 1976 delivery and an April 1, 1975 permit for a nine-story building (a presolicitation permit allowed only five stories).

**3.** Dr. Tauber testified on deposition that he and SJV could theoretically have built the building without construction and permanent bank financing, but that he did not wish to do so for business reasons.

In the interim, the building was timely completed and is now partially occupied by about 800 employees of the Federal Bureau of Investigation, the Civil Service Commission, the Department of the Air Force, the Army Surgeon General's office and the Air Force Judge Advocate General's Office.

Before accepting the SJV offer, in addition to obtaining proof of a building permit and zoning law compliance, GSA had communicated with some other local and federal government agencies: the National Capital Planning Commission ("NCPC"), the Department of Housing and Urban Development ("HUD"), and the District of Columbia Environmental Services ("D.C. Environmental Services"). GSA also received a letter from Melvin Mister, Executive Director of the District of Columbia Land Agency ("RLA").

NCPC advised GSA that, while the zoning square in which the Buzzard's Point building would be located was zoned for manufacturing and office uses, construction of an office building there was not compatible with NCPC's policies and with proposals being formulated by an Interagency Task Force for the area.

RLA, possibly responding for itself and HUD, requested GSA to consider locating SEC in the inner city and urban renewal areas and to lease space there for more than five years. GSA responded to RLA by advising that it had considered location of SEC in a neighborhood with low or moderate income residents, but it was not authorized by Congress to make a lease longer than five years for SEC space. GSA made no direct response to NCPC.

On June 1, 1976, two days before the lease was accepted, GSA staff completed an environmental assessment for two sites for SEC use, one of which related to the Buzzard's Point site. The assessments found that the GSA lease and occupation of either site would not be a major federal action significantly affecting the quality of the human environment and that acquisition of either site would not require a full-blown environmental impact statement.

The June 1 assessment contained approximately 50 typed pages (plus appendices) and was prepared in a very short time. For example, six pages under the caption "Physical and Biological Setting and Impact" were devoted to a description of general weather conditions in Washington. This section concluded that the project would have "only minimal impact on the micro-climate of Buzzard's Point, since the site presently consists of raw earth and pavement that are devoid of most vegetation." The assessment added, moreover, that "[t]he design of the building . . . will take into consideration the climactic conditions of the Washington, D. C. area by providing air conditioning and other features for employees."

There was specific discussion of the transportation needs of employees and the resources available to meet those needs. GSA expected the building to accommodate up to 2,300 SEC employees. (There are 800 government employees there each day now.) The assessment acknowledged that the transit system in the area is "minimal" and that the "poor availability of mass transportation will create a problem for employees." For example, the nearest subway stop was about one mile from Buzzard's Point and the route from the building to the stop was considered by GSA to be "hazardous" for pedestrians. The nearest bus stop was two blocks away along the same pedestrian route. There was no through bus service; bus passengers would have to transfer.

In considering possible amelioration, the assessment noted Metro's limited financial condition and limited capacity available at rush hour and concluded that "obtaining additional service would be difficult and time consuming." *A fortiori*, the assessment concluded: "commuter reliance on private autos is required."

It was estimated that the commuters would use more than 700 private automobiles each business day. The assessment described the resulting parking problems, suggesting that in addition to 271 spaces to be provided by GSA for selected employees

(apparently without cost to them), other employees could be expected individually to lease space from private lot owners in the neighborhood or park on the street. The assessment further noted, however, that the site was on a peninsula so that auto access to the immediate area was "limited and poor in character." Employee dependence on hundreds of private autos would increase traffic congestion on M Street, the direct approach route, "as well as arterial routes leading to the general area." The solution proposed for the transportation problems inherent in the situation were "flextime" work schedules and car pooling.

The assessment, having acknowledged the necessity for automobile commuting, gave some attention to air quality problems in the Washington area noting that "the air quality standards for . . . pollutants are occasionally exceeded in the District of Columbia, except for nitrogen dioxide" and that pollutants in Washington "are generally the result of motor vehicle use." The assessment further noted that "lowering the peak oxidant levels requires reduction in hydrocarbon levels, which generally are high during the a. m. period and attributable to the heavy motor vehicle use at that time." The assessment observed, however, that the office building is near a generating plant of Potomac Electric Power Company which "is the major source of air pollution at [the] site." Accordingly, the assessment observed, "[a]ir pollution from automobile exhausts would not be so significant as that emanating from [the] plant, since the site of the proposed project is a peninsula-like location, with no through traffic." From the foregoing, the assessment noted that while the project would not be a "direct source" of air pollution, the automobile emissions generated by the proposed project will be a "probable" source of an unquantified amount of air pollution in the area. It concluded finally that "there will be some unavoidable congestion and additional air pollution during peak hours of traffic." For remedy the assessments noted that developers will be required to receive the approval of the administrator of the Environmental Protection Agency for any parking areas including 250 spaces or more.[4]

## II. *Discussion*

If actions, such as those taken by GSA in leasing and occupying the building at Buzzard's Point constitute, in the aggregate, "major Federal action significantly affecting the human environment," GSA is required by the National Environmental Policy Act of 1969 to prepare and circulate an environmental impact statement. 42 U.S.C. § 4332(2)(C).

The phrase "major Federal action" has been construed by the Courts to require an inquiry into such questions as the amount of federal funds expended by the action, the number of people affected, the length of time consumed, and the extent of government planning involved. *E. g., Hanley v. Mitchell,* 460 F.2d 640, 644 (2d Cir.) *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Natural Resources Defense Council v. Grant,* 341 F.Supp. 356, 366–67 (E.D.N.C.1972). The guidelines of the Council on Environmental Quality[5] indicate that this phrase should be "construed by the agencies with a view to the overall, cumulative impact of the proposed, related Federal actions . . . in the area, and further acts contemplated." 40 C.F.R. § 1500.6(a). The related federal actions in this case include the five-year $11 million Congressionally approved lease of a nine-

---

4. In August 1974, GSA had contacted the Department of Environmental Services of the District of Columbia to obtain the Department's opinion on GSA leasing 271 parking places for the SEC near its location then. GSA supplied the Department with extensive information on the SEC plans to consolidate either there or at a new location. The opinion received by GSA was generally negative.

5. These guidelines provide direction to the federal agencies in determining the necessity of an environmental impact statement and in preparing one when required. 40 C.F.R. § 1500 *et seq.* The Second Circuit has recently utilized the guidelines quoted above in an inquiry as to the existence of major federal action. *City of Rochester v. United States Postal Service,* 541 F.2d 967 (2d Cir. 1976).

story office building to be built to GSA specifications in an industrial/residential neighborhood and the subsequent federal occupancy of the building by transferring to it up to 2,300 federal employees who must commute primarily by automobile. By definition, this is major federal action. The Court turns therefore to consideration of the impact of the action.[6]

Our Court of Appeals requires this Court, in evaluating impact, to ascertain whether GSA's environmental assessments present "convincing reasons" that the arguably potential environmental impacts associated with the action are truly insignificant. *Maryland-National Capital Park & Planning Comm'n v. U. S. Postal Service,* 159 U.S.App.D.C. 158, 168–70, 487 F.2d 1029, 1039–41 (1973).

Questions to be considered by this Court in testing GSA's reasons include:

1. Did the agency take a "hard look" at the problem, as opposed to making a bold conclusion?

2. Did the agency identify the relevant areas of environmental concern?

3. As to problems studied and identified, does the agency make a convincing case that the impact is insignificant? 159 U.S. App.D.C. at 69, 487 F.2d at 1040.

Review of the GSA environmental assessments here show that GSA failed to answer these questions satisfactorily in respect to Buzzard's Point:

1. Counsel for the defendants admitted that the assessments were prepared "pretty quickly," and the Court's examination of these assessments confirms this characterization. The first environmental assessment consumes about 50 pages, but it either omits, or discusses in generalities, the specific environmental interests that plaintiffs allege will be affected by the GSA action. Many pages of this assessment discuss, almost in the abstract, general conditions that apply to the Washington area as a whole, such as the local weather, wildlife, vegetation and geology. The discussion of specific environmental values at risk in the Buzzard's Point area is very limited, often conclusory, and, as is further discussed below, clearly inadequate. Later assessments omit the generalities, but offer little improvement on the specifics. There is little in any of these assessments which persuades this Court that GSA took the required "hard look" at these interests.

2. The assessments provide little or no discussion of several environmental values alleged by citizens to be significant: for example, the need for roadbuilding and upgrading, the safety threat (particularly to children and senior citizens) from the increased traffic in the area, the need for secondary community development (*e. g.,* stores, restaurants, shops, etc.), and the impact on housing, community services, and the economic condition of the area. Furthermore, the lease ends in 1981; the assessment should have anticipated the consequences to the neighborhood of the possible abandonment of this building at that time. Because of the failure of GSA to focus on these environmental concerns, the Court has no way of determining their significance. Yet, the burden in this respect is placed by our Court of Appeals upon GSA, and not the citizens.

3. Most important, with respect to the third criterion, the potential impacts on traffic and air quality of GSA's lease decision and subsequent assignments of personnel to Buzzard's Point are, by any definition, *at least* "arguably" significant. Traffic and air quality are two of the most fragile elements of the Washington area environment. The assessment's analysis of the traffic and air quality impact of the Buzzard's Point building and its hundreds of automobile commuters plainly fails to offer the convincing reasons required to permit GSA to forego an environmental impact statement. Specifically, GSA failed

---

**6.** Some courts have bypassed or considered only lightly the dimensions of the federal action, if the action, whatever its dimension, could have significant environmental effects. *E. g., Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1321–22 (8th Cir. 1974); *Mount Vernon Preservation Society v. Clements,* 415 F.Supp. 141, 146 (D.N.H.1976).

to quantify particular impacts such as the effect of 2,300 commuting employees in more than 700 private automobiles upon air pollution in Washington, and the cumulative effect of this automobile use when combined, for example, with other such uses required by other GSA actions. Nor is there any showing that it is infeasible to quantify the traffic or the air pollution effect caused by automobile commuting to Buzzard's Point by government employees who, but for their transfer, would have had better access to public transportation or would have otherwise been able to get to work without using an automobile. Finally, the assessment advances no persuasive suggestions for avoiding or ameliorating those traffic and air quality impacts which it does identify.[7]

In general, the Court notices that at the time of the GSA lease decision the federal government was in the process of spending several billion dollars on Washington's new subway system, and federal and local agencies were struggling to persuade commuters to turn away from automobiles to public transportation. Yet there is no reflection in the assessments of any GSA sense of serious responsibility for facilitating subway use and reducing private automobile use by government-employed commuters. There is no suggestion in the assessments, for example, of the existence of any overall GSA undertaking to locate new government offices in Washington at sites accessible to the subway and to through bus routes. *A fortiori*, the assessments do not test the Buzzard's Point project for compliance with any such GSA plan, or suggest consideration of any alternative site which would be better served by public transportation.

It may be, of course, that when the rush hour impact of 2,300 commuters in hundreds of private automobiles on traffic and air quality is quantified in an environmental impact statement, the harm will be demonstrably (or relatively) *de minimis*. And these quantities, even accumulated with ef-

fects of any other similar GSA space acquisitions, may not be sufficiently significant to be actionable or to justify a remedy. But an impact statement, which quantifies the traffic, air pollution and other relevant effects of GSA's Buzzard's Point actions and stimulates the informed comments of interested citizens and government agencies, may demonstrate that the GSA action did, in fact, have significant impact. These comments may also identify specific forms of relief for consideration by GSA or the Court, such as expenditure by GSA of the funds necessary to provide shuttle buses from Buzzard's Point to the subway station, to pay for night light and security on the hazardous pedestrian routes to public transportation or the imposition of conditions on GSA-subsidized parking which would tend to induce commuters to use a GSA-supported public transportation system instead of private automobiles.

Accordingly, the Court concludes that the potential impact of GSA's Buzzard's Point decisions is, at least, arguably significant and that the reasons advanced by GSA for not preparing an environmental impact statement are not convincing. Unless there is some defect in citizens' standing to sue, or unless GSA can establish that it has no responsibility either for the action at Buzzard's Point or its possible impacts, the Court should grant summary judgment for plaintiffs and require prompt preparation of a comprehensive environmental impact statement.

GSA contends, however, in support of its motion for summary judgment and in opposition to the citizens' motion, that, even if these are major actions with significant impact, the matter is now beyond the power of the Court on the grounds that:

(1) The case is moot and no relief can be ordered by the Court because the building is complete and at least partially occupied; and

---

7. In addition to the impacts on traffic and air quality, the assessment recognizes that the building will produce 30,000 gallons of sewage per day and that Washington area sewage facil-

ities are completely saturated . But the assessment mentions neither the cumulative effect of another 30,000 gallons nor makes any suggestion for amelioration of this effect.

(2) This is a privately owned building which its owner would have built and rented to another if GSA had not acquired the lease; therefore, GSA contends, the citizens have no standing to sue. Indeed, GSA's counsel maintained in open court that there was no causal connection between the GSA action and the construction of the building in question.

■ These defenses are vulnerable to short answers. As to mootness, GSA actions have continuing impact at every weekday rush hour. It is plainly within the power to the Court to enjoin any continuing nuisance or even less notorious government related environmental impacts which occur without being previously evaluated in an environmental impact statement. Moreover, the citizens, who are neighbors in Southwest and residents of the larger area which may be affected, have a legal right, at the very least, to learn (and GSA has a legal duty to ascertain and report to them) the actual dimensions of the impacts of the GSA actions. Only then will plaintiffs and the Court know the actual significance of the impacts. Thus, the citizens have standing and the case has life, at least to test GSA's uninformative assessments of the impact of its actions at Buzzard's Point against a full environmental impact statement. For now, the Court concludes that the citizens have standing, at least to this extent, and are entitled to a judgment now, tailored to their standing.

In this posture of the case, defendant's denial of causal connection between the federal action and possibly significant impacts is without either meaning or merit. Defendant relies for this defense upon testimony by the principal partner in SJV that if GSA had failed to lease the building, SJV would have leased it to private tenants. Thus, it is argued, there is no causal connection between the federal action and possible impacts: the plaintiffs have no risk of special harm and therefore no standing to seek relief because they would suffer the same impact irrespective of GSA's decisions and actions. *See Warth v. Selden,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Furthermore, GSA argues, since causal connection is a material fact in dispute, plaintiffs' motion for summary judgment does not lie, and a trial is necessary to resolve the causal connection issue.

■ On consideration, the Court concludes, however, that the only "fact" in dispute is whether SJV would have built the building and leased it to others if GSA had failed to lease it. This is a purely hypothetical question, the answer to which would necessarily rest on speculation. A trial to resolve such an issue would be an exercise in futility. Therefore, the Court holds that the question of what SJV would have done if GSA had not accepted the SJV offer is not a genuine issue within the meaning of Fed.R.Civ.P. 56 and failure to resolve it does not preclude granting of citizens' motion for summary judgment.

■ Nor, for that matter, is it necessary to resolve the question of whether there is a causal connection between the GSA action and the construction. There is plainly a causal connection between the GSA action and the daily presence of several hundred government-employed automobile commuters in the plaintiffs' neighborhood, some of whom would, but for their assignment to Buzzard's Point, be commuting elsewhere with at least an opportunity to use public transportation. The connection is no less causal because SJV testified that it would have leased to some other tenant. For ought that appears, that hypothetical private tenant, if it in fact materialized, might have occupied the site with fewer employees. Or a private tenant might have found it necessary to provide group transportation for non-government employees in order to attract them voluntarily to accept employment at Buzzard's Point—to which employees of SEC(and apparently of the Department of Treasury and Agriculture) successfully resisted assignment.[8]

---

8. The Court notes in this connection the extent to which the building is now occupied by employees of the military and of the F.B.I.

Thus, the critical undisputed material fact about which there is no genuine issue is that several hundred government-employed commuters travel by automobile to and from Buzzard's Point because GSA leased the space and caused the employees to be assigned there.

The Court reserves the question of the causal connection between GSA actions and the construction itself until an environmental impact statement is at hand. At that time, the Court can consider what further proceedings and what further relief, if any, may be indicated.

In this view of the case it is also unnecessary to resolve now the questions raised about GSA's responsibility to the citizens in respect of Executive Order 11512. The Order governs GSA's future actions, whether the citizens and this Court invoke it or not. The Court assumes, unless and until otherwise advised, that, at least, in preparing the environmental impact statement and in taking any actions there indicated, GSA will faithfully carry out the Executive Order or that GSA's superiors will see to it that the Order is carried out.

For now, therefore, the Court holds that the GSA lease decision and subsequent actions to occupy the premises with government employees are major federal actions with, *prima facie*, significant impact on the environment, and that plaintiffs' motion for summary judgment should be granted.

The filing of this amended opinion requires no amendment to the Order filed herein on January 11, 1978.