Viviana **MUNOZ–MENDOZA**, et al.,
Plaintiffs, Appellants,

v.

Samuel R. **PIERCE, Jr.**, et al.,
Defendants, Appellees.

No. 82–1706.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1983.

Decided June 13, 1983.

Rehearing Denied July 20, 1983.

See also 520 F.Supp. 180.

Albert W. Wallis, Quincy, Mass., with whom Frank I. Smizik, Boston, Mass., was on brief, for plaintiffs, appellants.

Janet E. LaBella, Washington, D.C., with whom Rachael M. Hopp, Asst. Gen. Counsel, Washington, D.C., was on brief, for The Nat. Committee Against Discrimination in Housing, Inc., amicus curiae.

Douglas N. Letter, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., William F. Weld, U.S. Atty., Boston, Mass., Michael Jay Singer, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Gershon M. Ratner, Associate Gen. Counsel for Litigation, Howard Schmeltzer, Sp. Asst. to the Associate Gen. Counsel for Litigation, and Mier Wolf, Senior Trial Atty., Office of Gen. Counsel, Dept. of Housing and Urban Development, Washington, D.C., were on brief, for federal appellees.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI,* Senior District Judge.

BREYER, Circuit Judge.

The plaintiffs in this suit are several minority residents of Boston's South End, South Cove, and Chinatown neighborhoods, and a Chinatown neighborhood association. In essence, they seek judicial review of a "final agency action," 5 U.S.C. § 704, the decision of the Department of Housing and Urban Development (HUD) to grant $19 million to the City of Boston to help develop the Copley Place commercial complex. The

* Of the District of Massachusetts, sitting by designation.

plaintiffs argue that the decision is unlawful because HUD failed to follow proper procedures in approving the grant. In particular, they assert that certain statutes and regulations require HUD to make a more thorough study than was performed of the grant's possible negative impact, through neighborhood upgrading and "gentrification," on residential integration in the area. They do not ask that the "agency action," the grant itself, be set aside; rather, they seek retroactive compliance with the alleged procedural obligation, namely, a proper study. And, in the event that a study bears out their contentions, they believe that HUD should be ordered to spend additional funds to keep their neighborhoods integrated or otherwise insulate them from the effects of racially unequal residential displacement.

The district court decided that plaintiffs could not show that the agency action of which they complained was likely to cause them "injury in fact." The court therefore held that they had not demonstrated the existence of the concrete "case or controversy" that Article III of the Constitution requires as a condition for the exercise of federal judicial power. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Because the plaintiffs were held to lack "standing" in this constitutional sense, the court dismissed their complaint for lack of subject matter jurisdiction before reaching the merits, and this appeal followed.

After reviewing the record, we conclude that the district court was correct as to the standing of certain plaintiffs and incorrect as to the standing of others. We remand this case as to those plaintiffs who have standing, so that the district court can determine: (1) whether the statutes and regulations that the plaintiffs rely on actually impose upon HUD the duty to conduct the type of "housing impact" study that the

plaintiffs seek; (2) if so, whether Congress intended the courts to review the manner in which HUD carries out any such duty, *see* 5 U.S.C. § 701(a)(2); (3) if so, whether HUD violated any such mandate in this instance; and (4) if all preceding questions are answered in the plaintiffs' favor, what relief is appropriate. None of these issues is directly before us on this appeal, nor was any argued in sufficient detail to allow us to decide it. We therefore limit our decision to the question of standing.

I

The following facts are not in dispute. In April 1980, the city of Boston asked HUD for an Urban Development Action Grant ("UDAG") to help it and private developers build Copley Place. This $450 million commercial project in downtown Boston will contain three million square feet of space, and will include a 712-room luxury hotel, a 960-room convention hotel, retail facilities, office space, parking facilities, and 100 to 150 units of housing, 25 percent of which will be subsidized and reserved for low-income tenants. The project is being built on 9.5 acres of previously vacant land next to the Massachusetts Turnpike, near the neighborhoods of Back Bay, Fenway, the South End, South Cove, and Chinatown.

As part of its application for the UDAG, Boston presented a study of the project's likely impact on local housing demand. It estimated that the project would generate increased demand for residential space that would in turn displace several hundred families. Soon thereafter, several neighborhood organizations, including the Chinatown Housing Task Force, a plaintiff here, complained to HUD's Boston area Division of Fair Housing and Equal Opportunity that the project would limit housing opportunities for low-income and minority residents in nearby neighborhoods. The Division considered the complaint; its director concluded that the minority displacement problem was serious; and further meetings were held with the complainants and others in Washington. HUD eventually decided to

provide a $19 million grant. While that grant was not conditioned precisely in the manner that the complainants had requested, HUD allowed the city to use the loan repayments (amounting to roughly $40 million) for various neighborhood development projects, including at least $2.5 million for low and moderate income residents. HUD concluded that the grant, in light of these terms, did not violate any civil rights laws or regulations.

In November 1980, six weeks after HUD announced the grant, the Task Force and seven individuals brought this suit. Six of the seven individual plaintiffs are black or Puerto Rican residents of the South End. The seventh is a Chinese resident of South Cove. The Task Force is a community advocacy organization, 75 percent of whose members are Chinese. The plaintiffs' primary legal claim is that Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, and various related HUD regulations required HUD to conduct a more thorough study of the impact of Copley Place on the racial integration of nearby neighborhoods. They point to several statutes, regulations, and cases that, they claim, support them: 42 U.S.C. §§ 2000d, 3608(d)(5); 24 C.F.R. §§ 1.1–1.12, 570.450–570.466; *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973); *Shannon v. HUD,* 436 F.2d 809 (3d Cir.1970); *Marin City Council v. Marin County Redevelopment Agency,* 416 F.Supp. 700 (N.D.Cal.1975).

The defendants, officials of HUD and the City of Boston, asked the district court to dismiss the complaint summarily on the ground that the action complained of—the decision to provide the grant—did not cause the harm that the plaintiffs allegedly will suffer. The defendants argued that the independent actions of private landlords and homebuyers, not the grant, would "cause" the rent increases, tenant displacement, and loss of integrated neighborhoods of which the plaintiffs complained. They added that, since other private and public development would continue in the absence of the grant, "gentrification" would occur

regardless of whether Copley Place were built.

Initially, the district court ruled against the defendants. But one year later, after additional discovery and the submission of considerable evidence through affidavits, the court held that the plaintiffs had not successfully shown that the HUD grant would cause the injuries of which they complained. *Munoz-Mendoza v. Pierce,* No. 80–2589–C (D.Mass. June 28, 1982). The court added that, in any event, conducting the residential impact study now would not provide the plaintiffs with meaningful relief, for withdrawal of HUD funding would not lead to abandonment of the project. The district court therefore dismissed the suit.

## II

The principles of standing are primarily aimed at determining whether a particular plaintiff is the type of person whom the law intends to protect against the type of harm of which he complains. The constitutional standing rules seek to ensure that a concrete Article III "case or controversy" exists by focusing on plaintiff's "harm." They ask whether the plaintiff "in fact" has suffered a redressable injury as a result of the defendant's actions. In the words of the Supreme Court, the plaintiff must demonstrate that his injuries " 'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 74, 98 S.Ct. at 2631 (citations omitted). This language imposes three fairly strict requirements, namely: (1) an injury; (2) a causal connection between the injury and the complained-of acts; and (3) redressability. *See, e.g., Valley Forge Christian College, supra; Community Nutrition Institute v. Block,* 698 F.2d 1239 (D.C.Cir.1983). An individual plaintiff must show that he himself has been injured; an association, like the Task Force, in some circumstances need show only that the interests of its members have been harmed. *See Hunt v. Washington Ap-*

*ple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin, supra.*

■ A plaintiff who has established the constitutional element of standing must go on to show that his "injury" is of a sort against which the law seeks to protect. *See Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. He may do so, for example, by showing that the harm of which he complains amounts to a "common law" injury, such as a tort. *See CBS, Inc. v. United States,* 316 U.S. 407, 422, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (1942); Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1723–25 (1975). Or he may show that his claim "falls within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). At the outset of the case, when standing questions are most often presented, he may have to show only that he is "arguably" within the zone of interests. *Association of Data Processing Service Organizations v. Camp,* 397 U.S. at 153, 90 S.Ct. at 829. These prudential requirements are typically excused only in unusual circumstances, such as where Congress has enacted a special "person aggrieved" statute, allowing a plaintiff to act as a "private attorney general," *see* 5 U.S.C. § 702 ("aggrieved within the meaning of a relevant statute"); *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), or where a special— *e.g.,* a constitutional—reason exists for allowing one person to assert the interests of another. *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

We mention the "prudential" standing requirements in order to show why they are not at issue here. If the plaintiffs' interpretation of the relevant statutes and regulations is correct, those statutes and regulations were designed specifically to prevent injuries of the type that plaintiffs allege. Whether plaintiffs' interpretation is correct, of course, is quite another matter; but, that question—the question of whether the plaintiffs assert a valid claim under the relevant substantive law—and the question of "prudential" standing, here collapse into one. Thus, the only standing question anyone need face is the threshold "constitutional" question—whether the plaintiffs have suffered "injury in fact" because of the defendants' actions.

■ Decisions of the Supreme Court and other federal courts suggest that factual issues concerning the existence of "injury in fact" are to be resolved much like any other factual issue. The ultimate burden of proving "injury in fact" rests with the plaintiffs. *NAACP v. Harris,* 607 F.2d 514, 526 (1st Cir.1979); *City of Hartford v. Town of Glastonbury,* 561 F.2d 1032, 1051 (2d Cir.1976) (en banc), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978). Where "injury" and "cause" are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity. *Warth v. Seldin, supra; Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973). The defendant thereafter can move for summary judgment, *Warth v. Seldin,* 422 U.S. at 501–02, 95 S.Ct. at 2206–07; *United States v. SCRAP,* 412 U.S. at 689, 93 S.Ct. at 2416–17; *NAACP v. Harris,* 607 F.2d at 526, and obtain it unless affidavits or other submissions indicate that a genuine issue of material fact exists concerning standing. *See Paton v. La Prade,* 524 F.2d 862, 867 (3d Cir.1975); *S.W. Neighborhood Assembly v. Eckard,* 445 F.Supp. 1195, 1202 (D.D.C. 1978). The court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or at trial itself. *See Gladstone,*

*Realtors v. Village of Bellwood,* 441 U.S. 91, 114–15 & n. 31, 99 S.Ct. 1601, 1615–16 & n. 31, 60 L.Ed.2d 66 (1979) (trial); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 67–68, 98 S.Ct. at 2627–2628 (pretrial hearing); *NAACP v. Harris,* 607 F.2d at 526 n. 15 (same); *Marchezak v. McKinley,* 607 F.2d 37, 40 (3d Cir.1979) (same); *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947).

Here we believe the district court has resolved all relevant factual issues. Although the parties and the trial court referred to the proceedings below in terms of "summary judgment," the record contains virtually all the evidence on the standing issue likely to become available. The court made factual decisions on a record that was essentially complete; and no one has complained about the court's decision to make findings of fact or asked us to reopen the factual inquiry. We therefore shall accept the district court's findings of fact unless we are convinced that they are "clearly erroneous." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 74 n. 19, 77, 98 S.Ct. at 2631 n. 19, 2632.

■ Applying a "clearly erroneous" standard, we agree that the plaintiffs have failed to show an adequate causal connection between HUD's action—the award of the UDAG—and *one* alleged injury, the risk that the plaintiffs will have to pay increased rents or move from their homes. The district court reasoned that the causal linkage involved—from the grant to the building of Copley Place, to increased demand for housing in nearby neighborhoods, to private landlords' decisions to raise the rent in the units occupied by the plaintiffs themselves, to the eventual need to find new housing—was simply too speculative. In the district court's judgment, the evidence did not support the inference that the UDAG would displace any *specific* individual. Even if we assume *arguendo* that the threat of displacement is immediate enough to avoid problems of ripeness, *but see City of Los Angeles v. Lyons,* —— U.S. ——, 103

S.Ct. 1660, 75 L.Ed.2d 675 (1983), we agree with the district court's finding.

In reviewing this finding, we are governed by the Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 42–46, 96 S.Ct. at 1926–28, in which a group of indigent plaintiffs challenged a ruling by the Internal Revenue Service allowing hospitals to qualify for certain "charitable" tax advantages without providing various free care services to indigents. The Court held that, in light of the many factors that go into a hospital's indigent care policy, it would be "purely speculative" whether the plaintiffs would be denied free health services as a result of the IRS ruling rather than because of other factors. We can find no meaningful distinction between *Simon* and this case with respect to the risk of displacement. Given the uncertainty as to whether any individual will have to pay increased rent or be displaced, and the much greater uncertainty about whether the same result would have occurred in the absence of the UDAG, this case involves just as much speculation as *Simon.*

■ The plaintiffs, however, also allege another, and different, sort of injury. They claim that the grant will increase racial segregation in nearby neighborhoods, and that as a result, they will lose the advantage of living in an integrated local community. There is no question that this *type* of injury is sufficient under Article III to allow standing to contest the legality of conduct that causes it, for the Supreme Court has specifically so held. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. at 112, 99 S.Ct. at 1614 (deprivation of "the social and professional advantages of living in an integrated community" is "sufficient to satisfy the constitutional standing requirement of actual or threatened harm"); *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *see Fox v. HUD,* 416 F.Supp. 954 (E.D.Pa.1976). The issue therefore is whether the plaintiffs have proved a sufficient causal connection between the grant and the harm to allow them to contest the lawfulness of the grant procedure. We believe that they have.

To prove the causal link, the plaintiffs must show three things. First, they must show that the UDAG was necessary for the construction of Copley Place. Second, they must show that Copley Place will increase local housing demand and rents. Third, they must show that higher rents and displacement of low-income tenants will result in a less "integrated community." The burden of proof rests on the plaintiffs, but the burden is not insurmountable; they need only demonstrate a "substantial likelihood" that the causal link exists. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20.

The district court did not take issue with the first link in the causal chain, nor do the defendants. Federal law forbids HUD from extending a UDAG unless it finds "a strong probability that the non-Federal investment in the project would not be made without" the federal funding. 42 U.S.C. § 5318(j); 24 C.F.R. §§ 570.458(c)(14)(ii), 570.459(q)(2). The City of Boston submitted affidavits stating that Copley Place would not have been undertaken without the grant. The project manager affirmed that "[b]ut for, and only for, an injection of public funding in . . . [the amount provided by HUD] can this project be undertaken." Himmel Affidavit in Support of Motion for Summary Judgment ¶ 37.

The second link is not disputed directly. No one denies the connection between the construction of Copley Place and increased local housing demand and rents. No one disputes that Copley Place is likely to lead to increased rents throughout the area. Rather, the defendants claim that the area would be redeveloped and rents would increase even if Copley Place were not built, *i.e.,* that Copley Place is not a necessary condition for the rent increases. And the district court agreed with this argument. It noted that other development was taking place in the area, and it stated that:

> Copley Place is but part of a larger continuing pattern of development in and around the South End area of Boston. This considerable property development

has undeniably generated an increase in area property values, which in turn has contributed to dramatic increases in the cost of rental housing in the area, which, of course, has a significant impact on those, like the plaintiff here, whose incomes may not be sufficient to meet those increases. Combined with other factors . . . the continuing property development and increase in the property values are sure to continue whether or not Copley Place is completed or becomes the success its developers hope it will be.

It is at this point that we part company with the district court. We do not doubt the correctness of its conclusion that "upgrading" and rent increases will continue whether or not Copley Place is built. But we do not see how it can be concluded, on the basis of the record, that upgrading and rent increases would continue at anything like the same pace and in anything like the same amounts in Copley Place's absence. The Copley Place project is a $450 million undertaking, which its developers expect will create over 6,000 permanent jobs in downtown Boston. It cannot seriously be contended that a commercial complex of this scale will not create a material impact on housing demand in neighborhoods adjacent to it. It is also impossible for us to believe—without record evidence—that, had the HUD grant been denied, some other project or set of projects, waiting in the wings, would soon have stepped forward and taken its place. *Cf. S.W. Neighborhood Assembly v. Eckard,* 445 F.Supp. at 1202. The record does suggest that $450 million projects in a midtown urban area take considerable time and effort to assemble—in this case, at least five years. The record provides no suggestion that a project similar to Copley Place could have been put together in less than five years. We do not see how to avoid the conclusion that Copley Place at least will cause several additional years of higher rents and more displacement than would have occurred in its absence.

The third link in the causal chain—the link between higher rents and less residen-

tial integration—is not seriously disputed with respect to the six individual plaintiffs who reside in the South End. The district court found in a prior opinion, and the defendants do not contest, that the South End is "a fully integrated residential neighborhood." *Munoz-Mendoza v. Pierce,* 520 F.Supp. 180, 182 (D.Mass.1981). According to the most recent census data, while nonwhites made up 33.6 percent of Boston's families in 1979, they accounted for 38.4 percent of families earning from 10 to 15 thousand dollars, 43.4 percent of those earning from 5 to 10 thousand, and 54.8 percent of those earning less than 5 thousand. Bureau of the Census, U.S. Dep't of Commerce, *1980 Census of Population and Housing—Supplementary Report: Advance Estimates of Social, Economic and Housing Characteristics—Massachusetts* 35 (1982). Given this racial stratification, and given the present racial balance in the South End, the displacement of low income residents in favor of more wealthy residents will disproportionately displace minorities and increase racial segregation in the South End. This is the plaintiffs' view, and it is nowhere denied. Therefore, even if rising rents do not displace the South End plaintiffs themselves, those plaintiffs can be expected to suffer the constitutionally material harm of residential racial segregation.

The seventh individual plaintiff, Kam Yum Lee, and the Task Force stand in a different position. Mrs. Lee is a resident of the South Cove neighborhood; the Task Force represents the residents of Chinatown. According to the most recent census figures provided by the parties, the population of the Chinatown-South Cove area is 80 percent Asian and Pacific Islander and only 14.5 percent Caucasian. As a result, any foreseeable displacement of poorer residents by rent increases is likely to make the two neighborhoods more, rather than less, racially integrated. That is not to say that Mrs. Lee, and their neighborhoods will suffer no harm; the character of their neighborhood may change, as they believe, for the worse. But this harm is not the special *legal* harm of residential segregation that the Supreme Court held sufficient to confer standing under *Gladstone, Realtors* and *Trafficante.*

We do not accept the Task Force's additional "injury" argument—namely its claim of direct injury as an organization due to HUD's allegedly cavalier treatment of its administrative complaint. The likelihood that the Task Force has suffered or will suffer "diminished stature, diminished volunteer power, [and] perhaps even diminished funding" is, at best, purely speculative.

The defendants make three additional arguments to avoid the conclusion that *any* of the plaintiffs has standing. First, they argue that the study sought by the plaintiffs might not have changed HUD's mind about the grant, and that the causal link between the inadequate study and the harm therefore has not been shown. This argument, however, confuses the agency *action* of which the plaintiffs complain with the *ground* for their complaint. The challenged action is the decision to extend the UDAG to Boston; the procedural "error," the failure to make an allegedly mandatory study. Article III of the Constitution does not require a plaintiff to show that use of a mandated procedure would change an agency's substantive action. *See United States v. SCRAP,* 412 U.S. at 687–90, 93 S.Ct. at 2415–17 (plaintiffs not required to show that environmental impact statement would have resulted in different ICC rate determination); *cf. City of Davis v. Coleman,* 521 F.2d 661, 670–71 (9th Cir.1975). To hold otherwise would mean that few, if any, plaintiffs would ever have standing to challenge agency actions on the basis of procedural errors, contrary to universal practice and the system of judicial review contemplated by the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(D) (requiring courts to "hold unlawful and set aside agency action ... [performed] without observance of procedure required by law"). Moreover, if plaintiffs were required to show that different procedures would result in different substantive choices, federal courts would be required to pass judgment, in the guise of a standing inquiry, upon substan-

tive issues that agencies rather than courts ought to resolve in the first instance.

■ Second, the defendants argue that the causal link is broken because the displacement and racial segregation at issue depend upon the voluntary actions of private parties, such as landlords who must individually and separately decide to raise their rents. This argument may be relevant to the substantive legal question of whether the statute and regulations are to be interpreted as the plaintiffs argue, but it is not material to the question of standing. The plaintiffs' basic claim is that the statutes and regulations oblige HUD not to give a UDAG without studying how third parties like landlords are likely to react and what the effect on residential integration is likely to be. If the plaintiffs are wrong on this substantive argument, they have no claim on the merits. If they are right, however, the involvement of third parties is no answer to their standing claim, for they would have suffered the very harm that Congress meant to protect against. The defendants' argument, at best, provides a reason for believing that Congress did not intend to impose this sort of obligation on HUD, an issue which the district court must first determine.

Third, the defendants argue that the court cannot provide meaningful relief to the plaintiffs, for Copley Place will be built even if a more extensive study were to persuade or require HUD to withdraw the UDAG funding. They point out that plaintiffs must show that their injury can be redressed by judicial relief in order to have Article III standing. *See City of Los Angeles v. Lyons,* —— U.S. at —— & n. 20, 103 S.Ct. at 1678–1679 & n. 20 (Marshall, J., dissenting); *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758; *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 74, 98 S.Ct. at 2630–2631; *Community Nutrition Institute v. Block, supra.* While we agree as to the existence of this principle, its application here does not defeat the plaintiffs' standing, for they seek relief within the power of the court to give. The plaintiffs do not

wish to stop the Copley Place project; rather, they believe that if the court orders a racial impact study, HUD and the City of Boston will either choose, or be required, to redirect some of the UDAG loan repayments in a way that redresses the plaintiffs' cognizable injuries. We do not pass upon the question of whether the plaintiffs are entitled to this relief; that depends on the correctness of their interpretation of the statute and regulation, their ability to prove a violation, and their success in demonstrating that this type of relief is appropriate to redress any such violation. At this stage of the proceeding, however, it seems safe to say that the district court has the power to provide such relief in appropriate circumstances. Certainly, the record provides no factual basis for finding that, should the plaintiffs prevail on all their other arguments, such relief could *not* help to cure the injury of which they complain.

We therefore hold that the district court correctly dismissed Mrs. Lee and the Task Force for lack of standing, but that it erred in ruling that the remaining plaintiffs lacked standing to pursue their claims.

### III

Because this case must be remanded for further proceedings, we offer several other comments for the guidance of the parties and the district court. First, as is apparent, we believe that this case in essence is a challenge to federal administrative action of the sort typically governed by the standards of the Administrative Procedure Act. *See generally* 5 U.S.C. §§ 701–06. In prior pleadings and before this court, the parties sought to cast the action in a different light, arguing as if the underlying issue were whether the plaintiffs possessed a private right of action under the relevant federal civil rights laws. This perspective has only limited value with respect to the plaintiffs' claim against HUD, for there is no need to locate a separate private right of action given the judicial review provisions of the APA.

■ The basis for the plaintiffs' suit against the Boston officials is less clear, in large part because it is unclear what role Boston has played in the actions that aggrieve the plaintiffs and what relief the plaintiffs seek from them. The plaintiffs do not have a right of action against the city officials under the APA, because neither Boston nor the Boston Redevelopment Authority is an "agency" within the meaning of the Act. *See* 5 U.S.C. § 701(b)(1); *City of Rohnert Park v. Harris,* 601 F.2d 1040, 1048 (9th Cir.1979) (APA does not create right of action against city urban renewal agency participating in federal urban renewal project); *Gibson & Perin Co. v. City of Cincinnati,* 480 F.2d 936, 941 (6th Cir.) (same rule with respect to city itself), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); *Window Systems, Inc. v. Manchester Memorial Hospital,* 424 F.Supp. 331, 336 (D.Conn.1976); *cf. Johnson v. Wells,* 566 F.2d 1016 (5th Cir.1978) (state parole board); *West Penn Power Co. v. Train,* 522 F.2d 302 (3d Cir.1975) (state environmental administrator), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976). We cannot determine at this point whether the plaintiffs will have to demonstrate that the relevant federal statutes provide them with private rights of action against these officials, or whether, given Boston's prior participation in the HUD proceedings, there are other avenues for including the city officials in the suit. The matter has not been argued here, but it may be considered by the district court.

■ Second, the plaintiffs complain of the district court's failure to certify their suit as a class action. Because we have held that some plaintiffs have standing to seek relief for certain sorts of injuries, but not for other sorts, and because the other plaintiffs have no standing at all, we believe it appropriate for the district court to reconsider the class action question in light of this opinion. *See* 28 U.S.C. § 2106; *cf. Inda v. United Air Lines, Inc.,* 565 F.2d 554, 562–63 (9th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 389 (1978).

Third, we reassert our view that there remain several difficult issues in this case. The plaintiffs must show that their substantive view of the statutes and regulations is a correct one. They must also show that Congress intended the courts, at the risk of interrupting or seriously delaying multi-million dollar projects aimed at helping distressed areas, to review agency "study" decisions *of the sort here at issue* in order to correct the type of abuse of discretion that the plaintiffs here allege. *See* 5 U.S.C. § 701(a)(2); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir.1970). Finally, they must prove that there was such an abuse of discretion. Because these issues have not been argued clearly before us, even though the first two are issues of law, we remand to the district court, which will have the first opportunity to decide them in light of the facts and arguments to be adduced.

*The judgment of the district court is affirmed in part and reversed in part. This case is remanded for further proceedings consistent with this opinion.*

On Petition For Rehearing

The federal appellees' petition for rehearing is denied. The federal appellees may in part be contending that they have not (in the context of these proceedings) had an adequate opportunity to present evidence on "the third link in the causal chain—the link between higher rents and less residential integration—... with respect to ... the South End." If so, they can present that contention to the District Court, which can decide whether (or when) further evidence should be presented.