Joan PLEUNE, Vernice Akpan, Elva Jiminez, Ruth Young, Alice Evans, Edith Brown and 467 Pacific Street Tenants' Association, Plaintiffs,

v.

Samuel R. PIERCE, Jr., individually and in his capacity as Secretary of the United States Department of Housing and Urban Development; Joseph D. Monticciolo, individually and in his capacity as Regional Administrator of Region II of the United States Department of Housing and Urban Development; Edward I. Koch, individually and in his capacity as Mayor of the City of New York; Roger Altman, individually and in his capacity as the Chairman of the New York City Public Development Corporation; Paul A. Crotty, individually and in his capacity as the Commissioner of the New York City Department of Housing Preservation and Development; and Rose Associates, Defendants.

No. 87 CV 2736.

United States District Court, E.D. New York.

Sept. 12, 1988.

Brooklyn Legal Services, Brooklyn, N.Y. (John C. Gray, Roger Juan Maldonado,

Jane Greenwald Stevens, Raun J. Rasmussen and Russell Engler, Brooklyn, N.Y., of counsel), for plaintiffs.

Peter L. Zimroth, Corp. Counsel (Jeffrey Shanback and Terri S. Feinstein, New York City, of counsel), for defendants Koch, Altman and Crotty.

Kaye, Scholer, Fierman, Hays and Handler (Richard Seltzer and Stan Alpert, New York City, of counsel), for defendant Rose Associates.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Susan P. Johnston, Asst. U.S. Atty., New York City, of counsel), for defendants Pierce and Monticciolo.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Defendants move pursuant to Fed.R.Civ. P. 12(b)(1) and 12(b)(6) for an order dismissing the Complaint. For the reasons discussed below, the motion is granted in part and denied in part.

### FACTS

At the heart of this controversy is the fate of the proposed Atlantic Terminal Project ("the Project"). The Project proposes to develop twenty-four acres, near the intersection of Flatbush and Atlantic Avenues in Brooklyn into an area that will include an office building, retail space, a cinema, a supermarket, a parking garage and residential condominium units for moderate income ($25,000–$48,000 per annum) families.

Pursuant to § 121 of the Housing and Community Development Act ("HDCA") the United States Department of Housing and Urban Development ("HUD") is authorized to make Urban Development Action Grants ("UDAG"), 42 U.S.C. § 5318. The purpose of UDAG program is to assist eligible cities and counties that are experiencing severe economic distress to stimulate economic recovery. *See* 24 C.F.R. § 570.450(a). New York City has qualified as a distressed community under 24 C.F.R. § 570.452. *See* 51 Fed.Reg. 5413–15 (Feb. 13, 1986).

Selection of projects to which UDAGs will be awarded is made on a nationwide comparative analysis of applications submitted, and takes into account a number of factors including the impact of the project on the economic conditions, fiscal base, and physical condition of the community. *See* 24 C.F.R. § 570.459.

Applications for UDAGs set forth detailed information concerning the project, including an analysis of the economic benefits that the activities are expected to produce; a statement analyzing the impact of the proposed UDAG on the residents of any affected residential neighborhood; data on anticipated involuntary displacement; and numerous certifications, including a certification that the applicant, prior to submission of its application, has performed the analysis of the impact of these proposed activities on the residents, as required by 24 C.F.R. § 570.454(b). *See* 24 C.F.R. § 570.458(c).

A UDAG application will not be approved unless the applicant has demonstrated that it has secured firm private commitments to fund the non-HUD balance of the project. *Id.* §§ 570.451(i), .459(b)(1). Once a project has received preliminary approval, an applicant will not receive funds until (1) a grant agreement between the applicant and HUD has been executed; (2) the environmental review of the total project is completed by the applicant; (3) the applicant has submitted to HUD evidence of legally binding private commitments; and (4) any other contractual conditions that must be met prior to funding have been adhered to by the applicant. *See id.* § 570.461. When all conditions have been met, HUD informs the applicant that the funds are available, and the applicant may draw on them through a letter of credit provided by HUD.

In the course of satisfying HUD's requirements, New York City (the "City") analyzed the impact the Project might have on the racial and ethnic makeup of surrounding neighborhoods. The impact area consisted of the ten census tracts closest to the Project. Relying on census data, the City's analysis described the exodus of nearly half of all white residents from the

area between 1970 and 1980.[1] The City concluded that the neighborhoods surrounding the Project are far more black and Hispanic than either Brooklyn or New York City.[2]

Based on this analysis, the City concluded that the Project would have little impact on the population of the area. Although the parties concede that gentrification has commenced in some parts of the impact area, plaintiffs dispute defendants' claim that further gentrification will not occur as a result of the Project. Defendants' claim is supported by the fact that low income residents in the impact area are protected from rising rents by virtue of City and State rent control and rent stabilization laws. Thus, defendants argue, the net secondary displacement effect of the project, if any, is likely to be minor.

The Project will be located in what defendants characterize as a severely economically depressed area of Brooklyn. A damaging exodus of people and jobs prompted the federal government, in 1968, to designate two Urban Renewal Areas there; but despite occasional plans for development, the Project site has remained virtually vacant for the past seventeen years. Defendants claim that in its present condition, the site generates few jobs and nominal tax revenue. On November 27, 1985, the City transmitted an application for a UDAG to HUD. The application sought $16,250,000 to assist the City and defendant Rose Associates, a private developer, to construct a mixed-use development on the long vacant site.

The City initially applied for a grant to be used in constructing 249,300 square feet for offices and residential condominium units for moderate income families. In particular, $6,250,000[3] of the grant was to be used to subsidize the cost of the housing units to ensure that they could be purchased by households with moderate incomes. Although housing could be constructed or renovated in the vicinity that would be competitive with other high income housing, housing available to low or moderate income persons, such as most of those living in the area at present, could not be constructed without subsidy.

The City projected that 1477 jobs,[4] many of which would be available to low and moderate income individuals living in the impact area, would be created at the site as a result of the Project. Sixty percent of these jobs were projected to be filled by Comprehensive Education and Training Act ("CETA")–eligible and low and moderate income people. Defendants expect that 48% of the jobs will be filled by members of minority groups. They also estimate an increase in tax revenues for the City as a result of the project in an amount to exceed $1.0 million per year.[5]

The UDAG application also contained representations by the other parties to the Project and their private lenders evidencing their willingness to enter into legally binding agreements following an award of a UDAG to the applicant.

Finally, the application contained the certifications required by 24 C.F.R. § 570.458 wherein the City assured HUD that it had analyzed the impact of the project on the

---

1. The City's analysis concluded the following:
   In 1970 the white population (including white Hispanics) was 52%, compared with 73% for Brooklyn as a whole. By 1980, the white population (including white Hispanics) in these census tracts had dropped to only 33%. In the ten years between census counts, the population of whites living in the area dropped by nearly one-half (a change of minus 48%). The white percentage (excluding white Hispanics) of the area's total population was only 23% as of 1980.

2.

| | Population Percentages | | |
| | Project Area | Brooklyn | New York City |
|---|---|---|---|
| White | 23 | 49 | 52 |
| Black | 46 | 31 | 24 |
| Hispanic | 30 | 18 | 20 |
| Other | 2 | 3 | 4 |

Johnson Decl.Ex.A. at II.B–14.

3. This figure was subsequently revised to $6,410,000. *See* Johnson Decl. ¶ 6. HUD is authorized to subsidize up to $15,000 per unit. *Id.*

4. This figure was subsequently revised to 1589. Johnson Decl. ¶ 7.

5. This number was subsequently revised to over $3.0 million per year. Johnson Decl. ¶ 8.

neighborhood as required by section 570.-454(b).

After completing its review of the application and receiving the firm commitments requied by 24 C.F.R. § 570.458(e)(5), in September 1986, HUD preliminarily approved the application for $10,730,000 (instead of $16,250,000) and for 273 (instead of 641) housing units. HUD will release the funds after the grant agreement is executed, the legally binding commitments required by 24 C.F.R. § 570.461(b) are provided and approved, and the City notifies HUD that it has satisfied the requirements under 24 C.F.R. § 570.461(c).

In October 1986, this action was commenced in the United States District Court for the Southern District of New York by six low income residents of the neighborhood and a tenants' association comprised of thirteen households at 467 Pacific Street ("Association"), an apartment building in the area. Complaint ¶¶ 1, 4–10. All of the individuals allege that they earn low incomes; all but Pleune and two households in the Association allege they are members of minority groups. Complaint ¶¶ 4–10. Plaintiffs Pleune, Akpan and Jiminez and the members of the Association allege that they have chosen for many years to live in the neighborhood, which they allege is integrated. Complaint ¶¶ 62, 75–96, 116–26. They allege that they may be forced to leave their homes if the Project is built, because rents may rise beyond levels they can afford to pay as result of the revitalization of the Project area. Complaint ¶¶ 81, 87, 96.[6] Plaintiffs Young, Evans and Brown allege that they live at the Brooklyn Arms Hotel, a welfare hotel in which they have been placed by the City (the "Hotel"). Complaint ¶¶ 97–115. They allege that the Hotel may be demolished or renovated, which will result in their expulsion and relocation. Complaint ¶¶ 102, 107, 113.

Plaintiffs allege that gentrification has already begun in the neighborhoods adjacent to the Project. Complaint ¶¶ 54, 80, 85, 94–95, 124. They further allege that the people who will be drawn to the Project area by its revitalization will be predominantly white, resulting in segregation. *Id.* at ¶ 54–64, 74, 80, 85, 94, 95, 124.

Plaintiffs further allege that these injuries are caused by HUD's failure (a) to analyze the impact of the Project on the neighborhood, and (b) to mitigate the potential secondary displacement by conditioning the grant on construction of low income housing and minority employment in the businesses to be housed by the Project. Complaint ¶¶ 1, 68–75, 128–39. They also allege that the applicant did not have the required firm commitments before HUD preliminarily approved the UDAG, and that this violated HUD's duties under the HDCA. *E.g.*, Complaint ¶¶ 38–45, 140–42.

Plaintiffs seek preliminary and permanent injunctions, as well as declaratory relief. They request the Court to (1) order withdrawal of HUD's approval of the UDAG; (2) order that no approval be given until a "meaningful" analysis is made of the effects on the neighborhoods; (3) order that the federal defendants condition any approval of a contractual commitment by the City and Rose Associates to develop and implement mitigating remedies; (4) order the federal defendants not to disburse any funds until the City and Rose Associates have signed a grant agreement to implement such mitigating remedies; (5) order the federal defendants not to approve a grant without a firm private commitment, and (6) order the federal defendants not to disburse any funds without a legally binding private commitment.

Defendants subsequently bought this motion. By order dated July 15, 1987, (Lowe, D.J.) the action was transferred to this District. All defendants challenge plaintiffs' standing to bring this action. The federal defendants also claim that the Complaint must be dismissed because plaintiffs' claims are barred by sovereign immunity and because there is no private right of action under 42 U.S.C. § 3608 or under

---

**6.** These plaintiffs all fail to mention whether they are protected by rent control or rent stabilization.

Title I of the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.*

## DISCUSSION

### I. STANDING

■ In theory, whether a plaintiff has standing under Article III of the Constitution can be determined by a rather simple and well-settled formula. Plaintiff must demonstrate (1) "a personal stake in the outcome of the controversy", *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), which amounts to a "distinct and palpable injury to himself," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); (2) that is redressable by the court, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); and (3) "a fairly traceable causal connection between the injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978).

As is this case with most legal formulae, each of these three deceptively simple requirements contain sub-requirements—satisfaction of which hinges on fine distinctions. As defendants point out, the instant case is strikingly similar to *Munoz–Mendoza v. Pierce*, 711 F.2d 421 (1st Cir.1983). There are, however, distinctions between this action and *Munoz–Mendoza*, one of which is significant—here the Court is dealing with a motion to dismiss pursuant to Rule 12(b) without the benefit of any discovery. *Compare id.* at 424.

### A. *Injury*

■ Plaintiffs allege that the Project will cause property values to rise in their neighborhoods, which may cause their landlords to raise their rents. This increased rent may force plaintiffs to relocate. Defendants challenge this alleged injury on the groud that it is too speculative.

With respect to plaintiffs residing in the Hotel, defendants similarly challenge as speculative their claim that the Project may result in the Hotel's condemnation. De-fendants also point out that the residents of the Hotel, who are homeless and are living rent-free on a temporary and emergency basis, are required by New York City law to seek other housing as soon as possible. *See* N.Y.C.R.R. § 352.3(e), (f). If this was all plaintiffs alleged, defendants' challenge would be sustained. *See Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1664–1665, 75 L.Ed.2d 675 (1983) ("the injury or threat of injury must be 'real and immediate', not 'conjectural' or 'hypothetical' "). *See also Munoz–Mendoza, supra,* 711 F.2d at 426 (threat that UDAG would displace any specific individual too speculative).

However, plaintiffs further allege that even if they were not forced from their homes, construction of the Project will cause segregation of their presently integrated neighborhood. Alleged deprivation of the "advantages of living in an integrated community" is "sufficient to satisfy the constitutional standing requirement of actual or threatened harm." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 112, 99 S.Ct. 1601, 1614, 60 L.Ed.2d 66 (1979). *See Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Whether the neighborhood is presently integrated, however, is a hotly contested issue. Defendants submit the 1986 Environmental Impact Statement and the 1980 census data that conclude that the ten census tracts surrounding the project have a 76% minority population.

Plaintiffs challenge the reliability of the eight-year-old census report, arguing that the demographics of the impact area have changed since 1980. In support of the allegations in the Complaint, plaintiffs have submitted affidavits from several area residents who state that, contrary to defendants' conclusion, the impact area is presently integrated. Although this evidence is conflicting, the Court is satisfied that plaintiffs' injury—to wit, segregation of a presently integrated neighborhood—"adequately appear[s] from all materials of record." *Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). *See Marine Midland Bank v. Miller*, 664

F.2d 899, 904 (2d Cir.1981) (prima facie showing of jurisdiction suffices to defeat Rule 12(b)(2) motion absent a hearing); *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (same).

B. *Causal Connection Between The Alleged Segregation and HUD's Approval of the UDAG*

"To prove the causal link, the plaintiffs must show three three things. First, they must show that the UDAG was necessary for the construction of [the Project]. Second, they must show that [the Project] will increase local housing demand and rents. Third, they must show that higher rents and displacement of low-income tenants will result in a less 'integrated community'." *Munoz–Mendoza, supra,* 711 F.2d at 427.

Defendants do not challenge the existence of the first requirement. Indeed, the city defendants stated in their UDAG application that "[b]ut for the UDAG ... the project is not feasible."

In paragraphs 57–61 and 74 of the Complaint, plaintiffs allege that the Project will cause increased housing demand and rents in their neighborhoods. Plaintiffs do not dispute defendants' claim that increased housing demand and rents is a "consequence of the economics in the area housing market." *Warth v. Seldin, supra,* 422 U.S. at 506–507, 95 S.Ct. at 2208–09. On the contrary, affidavits of area residents submitted in opposition to this motion state that residents have already been forced to relocate because of rent increases or because buildings were converted into cooperatives or condominiums. *See, e.g.,* Affidavit of Pleune at ¶ 2, Cody at ¶ 3, Pingel at ¶ 5, Oliver at ¶ 3, Hauptman at ¶¶ 4, 5 and Stanton at ¶ 7. It thus appears that the impact area is experiencing redevelopment and rising rents independent of the Project.

Nor do plaintiffs dispute defendants' claim that City and State rent control and rent stabilization laws protect many of the residents in the impact area from rent hikes. *See* Administrative Code of the City of New York § 26–405 (rent control) and § 26–510 (rent stabilization), Emergency Tenant Protection Act of 1974, N.Y.Unconsol.L. § 8624 (McKinney 1988).

Instead, plaintiffs place much reliance on the conclusion reached in *Munoz–Mendoza* wherein the development of Copley Place, a $450 million undertaking that was projected to create 6000 permanent jobs, was challenged. The First Circuit concluded that it could not "seriously be contended that a commercial complex of this scale [would] not create a material impact on housing demand [and] ... cause several years of higher rents and more displacement than would have occurred in its absence." *Munoz–Mendoza, supra,* 711 F.2d at 427. Although the Project is not nearly as large as Copley Plaza, the Court is unable to determine at this point the precise impact the Project will have on the area housing market. Defendants' argument, that rent control and rent stabilization mitigate, if not eliminate, housing concerns, is unavailing: although plaintiffs allege that 75% of area residents are renters, there is no evidence in the record indicating how many of those renters are protected by rent control or rent stabilization laws. The absence of this evidence is fatal to defendants' argument on this issue.

In paragraphs 54–67 and 74 of the Complaint, plaintiffs allege the third link in the causation chain: that construction of the Project will engender segregation in their neighborhoods. The Court has already determined that for purposes of standing, the impact area is presently integrated. *See supra,* Part I.A. Although defendants maintain that the area is segregated, they do not dispute that construction of the Project will cause an influx of white residents. The addition of a disproportionate number of white residents will, if plaintiffs are correct, upset the balanced integration they currently enjoy.

Since each part of the causal chain has been satisfied, the Court concludes that a *sufficient causal connection between the Project and the alleged injury has been* established.

C. *Redressability*

A final standing requirement plaintiffs must satisfy is that their alleged injury "is

likely to be redressed by a favorable decision." *Eastern Kentucky Welfare Rights, supra,* 426 U.S. at 39, 96 S.Ct. at 1924; *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

Defendants argue that because private individuals made the decisions to raise or lower rents in any given dwelling, and because the impact area is already experiencing an increased percentage of white residents, the Court is unable to redress plaintiffs' concerns regarding segregation.

The *Munoz–Mendoza* court rejected a similar argument that is equally applicable here:

> The plaintiffs do not wish to stop the Copley Place project; rather, they believe that if the court orders a racial impact study, HUD and the City of Boston will either choose, or be required, to redirect some of UDAG loan repayments in a way that redresses the plaintiffs' cognizable injuries. We do not pass upon the question of whether the plaintiffs are entitled to this relief; that depends on the correctness of their interpretation of the statute and regulation, their ability to prove a violation, and their success in demonstrating that this type of relief is appropriate to redress any such violation. At this state of the proceeding, however, it seems safe to say that the district court has the power to provide such relief in appropriate circumstances. Certainly, the record provides no factual basis for finding that, should the plaintiffs prevail on all their other arguments, such relief could not help to cure the injury of which they complain.

*Munoz–Mendoza, supra,* 711 F.2d at 429.

Accordingly, plaintiffs have satisfied all of the requirements of standing, and defendants' motion to dismiss for lack thereof is denied.

## II. PRIVATE RIGHT OF ACTION UNDER THE FAIR HOUSING ACT AND THE HOUSING AND COMMUNITY DEVELOPMENT ACT

The Complaint's second, fourth, sixth and eighth claims allege violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.* ("HCDA"). HUD argues that there exists neither a waiver of sovereign immunity nor a private right of action under these acts.

Section 3608(e)(5) of the FHA directs HUD to

> (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.

The HCDA contains a specific nondiscrimination provision which provides:

> No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this subchapter.

42 U.S.C. § 5309(a).

Plaintiffs in *Latinos Unidos de Chelsea v. Secretary of Housing and Urban Development,* 799 F.2d 774 (1st Cir.1986) ("LUCA") pressed a claim similar to what plaintiffs seek here. After an extensive and compelling analysis, which included an examination of the factors set forth in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), for determining whether a private right of action implicitly exists in a statute, the *LUCA* court concluded that a challenge to HUD action under these sections can be made only pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA") and that no independent private right of action exists. *Id.* at 791–92 (FHA); *id.* at 793–95 (HCDA). Other courts have come to the same conclusion. *See, e.g., Montgomery v. United States Dep't of Housing and Urban Development,* 645 F.2d 291, 297–98 (5th Cir.1981) (Hill, J., dissenting) (HCDA); *N.A.A.C.P. v. Pierce,* 624 F.Supp. 1083, 1086–90 (D.Mass. 1985) (FHA), *vacated on other grounds,* 817 F.2d 149, 152 (1st Cir.1987); *Givens v. Chaires,* No. 3–83–0131–H, slip op. at 9–10 (N.D.Tex. Jan 23, 1984) (same); *Nabke v.*

*HUD,* 520 F.Supp. 5, 8–9 (W.D.Mich.1981) (HCDA). *Accord Anderson v. City of Alpharetta,* 737 F.2d 1530, 1534 (11th Cir. 1984) (FHA); *Alschuler v. HUD,* 686 F.2d 472, 476, 477–78 (7th Cir.1982) (same); *Business Association of University City v. Landrieu,* 660 F.2d 867, 873 (3d Cir. 1981) (same); *Foust v. Pierce,* No. 83–0582–R, slip op. at 7 (E.D.Va. Mar. 23, 1984) (same). *But see Montgomery, supra,* 645 F.2d at 294–97 (private right of action exists under HCDA); *Young v. Pierce,* 544 F.Supp. 1010, 1017–18 (E.D. Tex.1982) (private right of action exists under FHA but court fails to employ the *Cort* test).

■ Like the plaintiffs in *LUCA,* plaintiffs do not challenge HUD's compliance with the FHA and HCDA under the APA. Because review of HUD action under these statutes can only be brought under the APA, the second, fourth, sixth and eighth claims must be dismissed. Accordingly, the question whether sovereign immunity bars these claims is moot.

### CONCLUSION

Defendants' motion to dismiss the Complaint on the ground that plaintiffs do not have standing to bring this action is hereby denied. Defendants' motion to dismiss the second, fourth, sixth and eighth claims is hereby granted. Plaintiffs shall be permitted to amend the Complaint, consistent with this Order, within twenty (20) days of the filing thereof.

SO ORDERED.