USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1068 KENNETH ADAMS, SETH BUNKER AND RODNEY HUDSON, ET AL., Plaintiffs, Appellants, v. GREGORY WATSON AS COMMISSIONER, MASSACHUSETTS DEPARTMENT OF FOOD AND AGRICULTURE, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Michael L. Altman, with whom Margaret A. Robbins and Rubin & _________________ ___________________ _______ Rudman were on brief for appellants. ______ Eric A. Smith, Assistant Attorney General, with whom Scott _____________ _____ Harshbarger, Attorney General, was on brief for Commissioner of ___________ the Massachusetts Department of Food and Agriculture. Robert J. Sherer, with whom Francis A. DiLuna and Roche, _________________ __________________ ______ Carens & DeGiacomo were on brief for Massachusetts Farm Bureau __________________ Federation, Inc. ____________________ December 8, 1993 ____________________ CYR, Circuit Judge. Plaintiffs-appellants, New York CYR, Circuit Judge. ______________ and New Hampshire dairy farmers, instituted the present civil rights action against the Commissioner of the Massachusetts Department of Food and Agriculture (Commissioner) for declaratory and injunctive relief from an alleged unconstitutional enforce- ment of a Massachusetts milk pricing order. The district court dismissed their complaint for lack of standing. We now reverse. I I BACKGROUND BACKGROUND __________ On January 28, 1992, the Commissioner declared a state of emergency in the Massachusetts dairy industry, see Mass. Gen. ___ L. ch. 94A, 12 (1992), based on findings that rising production costs and flat dairy prices were devastating the industry.1 The Commissioner determined that a price stabilization system was necessary. The pricing order issued by the Commissioner on February 26, 1992, forms the focus of this appeal. The pricing order established a "Dairy Equalization Fund" (Fund), into which each licensed milk distributor (dealer) in Massachusetts is required to pay monthly assessments ("differ- ential assessments") equal to one-third of the amount by which the $15 price set by the pricing order exceeds the applicable ____________________ 1In 1991, for example, the average milk price paid Massac- husetts dairy farmers was $12.64 per hundredweight (cwt), whereas their average production cost was $15.50 per cwt an average loss of $2.86 per cwt. The Commissioner specifically found that the emergency threatened Massachusetts' local "supply of fresh milk." federal minimum or "blend" price per hundredweight (cwt).2 The differential assessment applies to all milk marketed in Massachusetts by licensed dealers, whether produced in Massa- chusetts or elsewhere. Notwithstanding the fact that dealers must pay the differential assessment calculated on all out-of- state and in-state produced milk, out-of-state producers, who supply most of the milk sold in Massachusetts,3 are not entitled to disbursements from the Fund. The monies in the Fund are distributed monthly among Massachusetts milk producers only, in direct proportion to their respective percentage of the total Massachusetts milk production, subject to a monthly payment cap to each Massachusetts producer equal to the differential assess- ment on 2000 cwt. Excess monies in the Fund are remitted to dealers in direct proportion to their payments into the Fund. Plaintiffs-appellants, out-of-state producers, sell their entire milk production to West Lynn Creamery, Inc., a ____________________ 2The United States dairy industry is subject to extensive price regulation. The United States Department of Agriculture promulgates federal milk marketing orders, pursuant to the Agricultural Marketing Agreements Act of 1937, 7 U.S.C. 601, et __ seq., which establish minimum milk prices. The marketing order ____ in effect in Massachusetts is New England Federal Milk Marketing Order No. 1 (Order No. 1). See 7 C.F.R. 1001 (1993). The ___ minimum milk price ("blend price") is calculated monthly, using a market-wide weighted average of the value of all milk sold during the preceding month. No state or dealer may permit regional milk producers to receive less than the per/cwt figure prescribed in Order No. 1. 3Plaintiffs allege that Massachusetts is not a "producer" or "export" state (like, for example, Vermont and Maine), but a highly vulnerable "consumer" or "import" state capable of produc- ing only 10% of the milk sold in the state. As a rule, out-of- state milk commands a high premium in "consumer" states like Massachusetts. 3 licensed Massachusetts milk dealer. Their original civil rights complaint demanded (i) a declaratory judgment that the pricing order violates the Commerce Clause,4 (ii) the refund of all amounts previously disbursed from the Fund to Massachusetts producers, and (iii) injunctive relief against further enforce- ment of the pricing order. The first amended complaint5 included allegations that the pricing order caused appellants competitive injury and economic harm.6 On defendants' motion, the district court dismissed the first amended complaint for lack of standing, finding its "general allegations of economic harm . . . unsup- ported by any specific, factual allegations of injury." Adams v. _____ ____________________ 4Commerce Clause violations may be redressed under 42 U.S.C. 1983. See Dennis v. Higgins, 498 U.S. 439, 443-51 (1991). ___ ______ _______ 5Two nonproducer plaintiffs (Massachusetts milk dealers) _______ voluntarily dismissed their claims, following the Commissioner's motion to dismiss their claims on Younger and Burford abstention _______ _______ grounds. The remaining plaintiffs, appellants here, filed the first amended complaint, which dropped the dealer-plaintiffs and withdrew a claim for damages. West Lynn Creamery, Inc., an original plaintiff, brought a separate state court action chal- lenging the pricing order, under which the Commissioner threat- ened to suspend its license to sell milk in Massachusetts for failure to pay its monthly differential assessments to the Fund. On April 15, 1993, the Massachusetts Supreme Judicial Court ruled that the pricing order did not violate the Commerce Clause. See ___ West Lynn Creamery, Inc. v. Commissioner of Dep't of Food and _________________________ ___________________________________ Agric., 415 Mass. 8, 611 N.E.2d 239, cert. granted, 62 U.S.L.W. ______ _____ _______ 3244 (U.S. Oct. 4, 1993) (No. 93-141). 6The first amended complaint merely alleged that the pricing order "has the same effect as a 'customs duty' or 'protective tariff' on the importation of milk produced in other states," "subsidizes Massachusetts farmers which causes the disorderly marketing of milk," causes out-of-state farmers, including plaintiffs, to suffer economic harm and competitive disadvantage because it subsidizes Massachusetts farmers, and may force out- of-state farmers, including plaintiffs, out of business. 4 Watson, No. 92-11641-Z, 1992 U.S. Dist. LEXIS 19306, at *4 (D. ______ Mass. 1992). The district court noted that the first amended complaint contained no allegations that the plaintiffs had sold less milk in Massachusetts since February 26, 1992, received a lower price for their milk, or were otherwise frustrated in their attempt to "undersell" Massachusetts producers. The district court denied plaintiffs' motion to recast their first amended complaint by adding two paragraphs for the stated purpose of alleging "with greater specificity 'injury in fact' to meet the requirement of more 'specific, factual allega- tions of injury.'" The district court summarily denied the ensuing motion for relief from judgment under Fed. R. Civ. P. 60. II II DISCUSSION DISCUSSION __________ A. Applicable Law of Standing. A. Applicable Law of Standing. __________________________ Article III of the Constitution limits federal "judi- cial power" to the resolution of "cases" and "controversies," see ___ U.S. Const. art. III; only if it is presented with a "case or controversy" may an Article III court entertain an action. See ___ Warth v. Seldin, 422 U.S. 490, 498 (1975); United States v. AVX _____ ______ _____________ ___ Corp., 962 F.2d 108, 113 (1st Cir. 1992). In its constitutional _____ formulation, the doctrine of standing is a gatekeeper of justi- ciability, and "serves to identify those disputes which are appropriately resolved through the judicial process." Whitmore ________ v. Arkansas, 495 U.S. 149, 155 (1990). The "irreducible consti- ________ tutional minimum of standing" entails three elements: 5 First, the plaintiff must have suffered an "injury in fact" an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely" as opposed to merely "specu- lative," that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992) _____ ______________________ (citations and some internal quotation marks omitted); see also ___ ____ Northeastern Fla. Chapter of Associated Gen. Contractors of Am. _________________________________________________________________ v. Jacksonville, 113 S. Ct. 2297 (1993); AVX, 962 F.2d at 113; ____________ ___ Munoz-Mendoza v. Pierce, 711 F.2d 421, 424 (1st Cir. 1983).7 _____________ ______ ____________________ 7Prudential limitations on the exercise of federal jurisdic- tion self-imposed rules of judicial restraint may be invoked even if all constitutional essentials are present. As the Supreme Court has acknowledged, however, "it has not always been clear in the opinions of [the] Court whether particular features of the 'standing' requirement have been required by Art. III ex proprio vigore, or whether they are requirements that the __ _______ ______ Court itself has erected and which were not compelled by the language of the Constitution." Valley Forge Christian College v. ______________________________ Americans United for Separation of Church and State, Inc., 454 ____________________________________________________________ U.S. 464, 471 (1982). Nonetheless, at least three prudential principles bear importantly on "standing". First, the litigant must assert its own legal rights and interests, not those of third parties. Warth, 422 U.S. at 499. Second, claimants with _____ "generalized grievances" shared by a large class of citizens and raising "abstract questions of wide public significance" normally will be denied standing, as such questions are more appropriately addressed to the representative branches of government. Valley ______ Forge, 454 U.S. at 475. Finally, the claim presented must come _____ within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of ______________ Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 ___________________________________ ____ (1970). In the instant case, appellees have not suggested that the appellant producers are asserting rights and interests other than their own; the complaint does not allege a "generalized griev- 6 The injury-in-fact inquiry "serves to distinguish a person with a direct stake in the outcome of a litigation even ______ _____ ____ though small from a person with a mere interest in the prob- ______ _____ lem." United States v. Students Challenging Regulatory Agency _____________ _______________________________________ Procedures (SCRAP), 412 U.S. 669, 690 n. 14 (1973) (citing ___________________ Kenneth C. Davis, Standing: Taxpayers and Others, 35 U. Chi. L. ______________________________ Rev. 601, 613 (1968) ("an identifiable trifle is enough for standing to fight out a question of principle")) (emphasis added); see Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982) ___ ______ ______ ("The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only that claimant "allege[] some specific, 'identifiable trifle' of injury . . . ."); Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, ________________________ __________ 138 (D.C. Cir. 1977) (distinct and palpable competitive injury is injury-in-fact for standing purposes even if economic injury is slight in magnitude), cert. denied, 434 U.S. 1086 (1978). Courts _____ ______ "may reasonably expect that a person so harmed will, as best he can, frame the relevant questions with specificity, contest the issues with the necessary adverseness, and pursue the litigation vigorously." Barlow v. Collins, 397 U.S. 159, 172 (1970). ______ _______ ____________________ ance" more appropriately addressed to another branch of govern- ment; and appellants, as milk producers who ship in interstate commerce, would appear to be within the "zone of interests" protected by the Commerce Clause, see Dennis, 498 U.S. at 449 ___ ______ (Commerce Clause was intended to benefit those involved in interstate commerce and is the source of a right of action on the part of those injured by state regulation of commerce) (citing Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 320 n.3 ___________________ ________________ (1976)). 7 The responsibility for "clearly and specifically set[ting] forth facts sufficient to satisfy the Article III standing requirements" rests with the claimant. Whitmore, 495 ________ U.S. at 155-56; see also Lujan, 112 S. Ct. at 2136; FW/PBS, Inc. ___ ____ _____ ____________ v. Dallas, 493 U.S. 215, 231 (1990); Warth, 422 U.S. at 518; AVX, ______ _____ ___ 962 F.2d at 114. Like the trial court, we "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth, 422 U.S. at _____ 501; see AVX, 962 F.2d at 114.8 "'[E]mpirically unverifiable' ___ ___ conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." Id. (quoting Dartmouth __ _________ Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989)). ______ _________________ Within this analytic framework, we examine appellants' claims. B. The District Court Decision. B. The District Court Decision. ___________________________ The district court found that the first amended com- plaint raised general allegations of "economic harm" or "competi- _______ tive disadvantage" but alleged no "specific" facts which would substantiate actual injury, such as reduced out-of-state milk sales to Massachusetts dealers, or lower milk prices to out-of- state producers. The court noted: ____________________ 8Although the Commissioner contends that the district court correctly applied AVX's "heightened" requirements for pleading ___ "standing," AVX, 962 F.2d at 113, we note no citation or refer- ___ ence to AVX in the district court opinion. Since we conclude ___ that the proposed second amended complaint meets either standard, however, we need not revisit AVX in light of the Supreme Court's ___ recent decision in Leatherman v. Tarrant County Narcotics Intel- __________ _______________________________ ligence & Coordination Unit, 113 S. Ct. 1160 (1993). ___________________________ 8 In complaining that the subsidy in itself injures out-of-state farmers, plaintiffs assume a perfectly competitive market in which a direct subsidy to local farmers re- sults in their capture of a larger market share because they can offer their milk at a lower price. Such analysis ignores the fact that there is [a] federal price support in effect. Because the milk dealers must pay the federal minimum price to any dairy farm- ___ er, there is no incentive to purchase local rather than out-of-state milk. Adams, No. 92-11641-Z, 1992 U.S. Dist. LEXIS 19306, at *4 n.4. _____ C. Allegations of "Competitive Injury." C. Allegations of "Competitive Injury." __________________________________ Since the proposed second amended complaint did not address the perceived deficiencies in the first amended com- plaint, and the district court did not elaborate on its reasons for denying the motion to amend, we assume that the court consid- ered the proposed amendment futile. See Correa-Martinez v. ___ _______________ Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 1990). According- __________________ ly, setting to one side the first amended complaint, we inquire whether the second amended complaint alleged an actual or immi- nent "injury-in-fact" proximately caused by the challenged pricing order. Id. (suggesting that denial of motion to amend ___ constitutes abuse of discretion "if no justification appears"). The second amended complaint, paraphrased, alleges that the following chain of economic events will result in appellants' loss of future income, profits, and business opportunities: All milk currently produced by appellants is sold in the Massachusetts milk market in direct competition with Massachusetts milk producers. As a direct consequence of the differential assessments Massachusetts milk dealers must pay into the Fund for each cwt 9 purchased from producers,9 consumer milk prices in Massachusetts will rise since dealers, in all likelihood, will pass along at least some portion of their increased costs to Massachusetts consumers.10 Consumer demand will decrease as prices increase. In this shrinking market, Massa- chusetts dealers will continue to buy all available milk produced in Massachusetts, because of their "preference" for local sup- __________ ___ _____ ____ plies, due to the lower transportation costs _____ and lesser producer-to-consumer delivery time (perishability being a major industry con- cern). Higher milk prices and increased dis- bursements from the Fund will induce greater milk production by Massachusetts producers, thereby lowering the current 90% Massachu- setts market share enjoyed by out-of-state producers. Moreover, even if Massachusetts milk prices were to remain relatively stable, individual Massachusetts producers would have a strong incentive to increase production over their fellow home state dairy farmers, since Fund disbursements are based on each producer's relative share of overall Massa- ________ chusetts milk production. __________ As Massachusetts producers increase their market share, out-of-state milk will be dis- placed, and "overflow" into interstate commerce. These resulting surplus "inter- state" supplies will deflate the federal "blend" or minimum price under Order No. 1. Since appellants previously sold their entire milk production in Massachusetts, some of their out-of-state milk will be "displaced" by Massachusetts-produced milk. As Massachu- setts consumer demand decreases, out-of-state producers will no longer be able to command ____________________ 9Appellants concede that the Fund's collection mechanism, by __________ itself, does not injure them. Since Massachusetts dealers must pay an assessment on every cwt purchased, whether produced locally or out-of-state, dealers could not reduce their assess- ments to the Fund by avoiding out-of-state purchases. 10By proscribing "unconscionable" consumer price increases, section VIII(b) of the pricing order merely places an outer limit on the total amount of differential assessment costs dealers may pass along to consumers. 10 the same premium prices (in excess of the federal "blend price") received before the challenged pricing order. See supra note 3. ___ _____ Massachusetts producers will be insulated from any federal blend-price deflation, be- cause, under the Fund's collection formula the greater the gap between $15 and the fed- ___ eral blend price, the larger the differential assessments Massachusetts dealers must pay into the Fund, and therefore, the larger the Fund disbursements to Massachusetts producers (but not to out-of-state producers). Unless remedied, the challenged pricing order event- ually would lead to the failure and closure of appellants' businesses.11 D. "Imminence" and "Particularity" of Economic Injury. D. "Imminence" and "Particularity" of Economic Injury. _________________________________________________ The district court correctly noted that appellants' current income and profits do not substantiate their allegations of economic injury. As of the district court dismissal order, appellants continued to sell their entire milk production to West Lynn Creamery, and neither the volume nor the price had abated since the pricing order went into effect. For their part, appel- lees cite to several cases holding that the "injury-in-fact" requirement is satisfied at the pleading stage by allegations that the plaintiffs sustained actual financial loss, fairly traceable to the challenged regulation, between its effective date and the filing of the complaint. See, e.g., Minnesota Milk ___ ____ ______________ Producers Ass'n v. Madigan, 956 F.2d 816, 818-19 (8th Cir. 1992) _______________ _______ ("The producers have alleged that the provisions of the Sec- ____________________ 11The Commissioner characterizes these dire forecasts as speculative. Nevertheless, the affidavit of West Lynn Creamery's president attests that the dairy industry's economic woes are not restricted to Massachusetts, and that out-of-state milk producers likewise are in precarious financial straits. 11 retary's orders directly cause a reduction in the price they receive for their milk.").12 Although at the pleading stage "injury-in-fact" need not entail currently realized economic loss, Article III standing ________ in the commercial context must be premised, at a minimum, on particularized future economic injury which, though latent, nonetheless qualifies as "imminent." See Lujan, 112 S. Ct. at ___ _____ 2136. Our review of the pertinent authorities satisfies us that the proposed second amended complaint alleges particularized future economic injury sufficient to support Article III stand- ______ ing. In Rental Hous. Ass'n of Greater Lynn v. Hills, 548 _____________________________________ _____ F.2d 388 (1st Cir. 1977), the Department of Housing and Urban Development (HUD) approved funding to convert factories into housing for the elderly. While the project was still in process, an association of local landlords brought suit in federal dis- trict court, complaining that the grant contravened Section 8 of the Housing and Community Development Act of 1974, and threatened "competitive injury" to the plaintiff association's members, who "will lose tenants to the new project." Id. at 389. Finding the ___ ____________________ 12The parties to the present appeal debate whether cases like AVX, dealing with "associational standing," have any bearing ___ on the question of the individual appellants' "injury-in-fact." __________ An essential element of "associational standing" is injury-in- fact to some member of the association. See AVX, 962 F.2d at ______ ___ ___ 116. Thus, insofar as these associational standing cases deal with the requirements of "injury-in-fact," we cite them through- out this opinion, as appropriate. 12 "competitive injury" allegations sufficient to survive a motion to dismiss, we stated: While the [] project is not yet completed, and hence specific proof of competitive inju- ________ _____ ry is not possible, it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late. We see no insurmountable obstacles __ ______________ _________ to proof of the likelihood that [plaintiff's] __ _____ members will lose tenants to the [] project. Id. (citation omitted) (emphasis added). We noted that many ___ cases uphold "competitor standing" based on "unadorned allega- tions" of latent economic injury. Id. at 390; see, e.g., Associ- ___ ___ ____ _______ ation of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 152, ____________________________________ ____ 154 (1970) (sellers of data processing services "no doubt" had standing to test ruling allowing national banks to sell data processing services; injury-in-fact element met by allegations that competition from national banks "might entail some future loss of profits" and that respondent bank was preparing to perform data processing services for two of plaintiffs' custom- ers); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 45-46 (1970) ___________________ ____ (holding that travel agents had "competitor standing" to test ruling allowing national banks to provide travel services); Investment Co. Inst. v. Camp, 401 U.S. 617, 620-21 (1971) (find- ____________________ ____ ing "competitor standing," on the part of investment companies, to test a regulatory ruling authorizing national banks to operate collective investment funds).13 ____________________ 13See also, e.g., Associated Gas Distribs. v. Federal Energy ___ ____ ____ ________________________ ______________ Regulatory Comm'n, 899 F.2d 1250, 1258 (D.C. Cir. 1990) (holding _________________ that, even if no "specific instances of existing competition" had been asserted, FERC's decision authorizes transportation and sale 13 The proposed second amended complaint meets the bench- mark for "competitor standing" established by these authorities. ____________________ of gas which "threaten AGD's members competitively, because AGD's members include local distribution companies who may lose busi- ___ ____ ness to allegedly illegal transactions") (emphasis added); Securities Indus. Ass'n v. Clarke, 885 F.2d 1034, 1038 (2d Cir. _______________________ ______ 1989) (securities dealers sufficiently alleged competitive injury-in-fact for "standing" to test regulatory ruling allowing banks to sell mortgage pass-through certificates), cert denied, ____ ______ 493 U.S. 1070 (1990); Bullfrog Films, Inc. v. Wick, 847 F.2d 502, ____________________ ____ 506 (9th Cir. 1988) (film distributors and exporters alleged sufficient injury-in-fact to test custom duties that "put[] their films at a competitive disadvantage in the international market- place . . . ., [a]lthough plaintiffs did not produce evidence that the payment of custom duties . . . caused decreased sales or profits"); National Coal Ass'n v. Hodel, 825 F.2d 523, 526 (D.C. ___________________ _____ Cir. 1987) (holding that Secretary of Interior's decision to allow land exchange so that plaintiff's competitor could mine "a large tract of previously unmineable land . . . undoubtedly ___________ satisf[ies] constitutional standing requirements") (emphasis added); Investment Co. Inst. and Securities Indus. Ass'n v. _____________________________________________________ Federal Deposit Ins. Corp., 815 F.2d 1540, 1543 (D.C. Cir.) ____________________________ (holding that FDIC ruling allowing insured nonmember banks to enter securities field will deal petitioners, who represent mutual fund companies and investment bankers, a "competitive injury"), cert denied, 484 U.S. 847 (1987); Sea-Land Serv., Inc. ____ ______ ____________________ v. Dole, 723 F.2d 975, 977 (D.C. Cir. 1983) (concluding that ____ plaintiff, which operated vessels on nonsubsidized trade routes, had alleged sufficient "competitive harm" to test a decision by Department of Transportation allowing subsidized carrier to call on ports off its subsidized route), cert. denied, 469 U.S. 824 _____ ______ (1984); Peoples Gas, Light & Coke Co. v. U.S. Postal Serv., 658 _____________________________ _________________ F.2d 1182, 1194 & n.9 (7th Cir. 1981) (finding that plaintiff, a gas company, which alleged "a loss of future revenue" from postal service's plan to install electric instead of gas system, had suffered a non-"speculative" competitive injury; judicial invali- dation of first bidding procedure "offer[s] at least a likeli- hood" that plaintiff, a potential bidder, would ultimately be awarded the government contract); P.A.M. News Corp. v. Hardin, _________________ ______ 440 F.2d 255, 257 (D.C. Cir. 1971) (concluding that plaintiff alleged competitive injury from Department of Agriculture's decision to allow free access to agricultural data, since plain- tiffs previously compiled and sold information to public); cf. ___ Simmons v. Interstate Commerce Comm'n, 900 F.2d 1023, 1026 (7th _______ ___________________________ Cir. 1990) (holding that rival shippers alleged sufficient injury-in-fact to contest ICC decision to permit abandonment of rail line, where plaintiffs' competitor's line remains open, although injury was not ultimately redressable by judicial action), cert. denied, 499 U.S. 919 (1991). _____ ______ 14 The Camp triad and Rental Housing cases are all premised on a ____ ______________ plaintiff's status as a direct competitor whose position in the ______ ______ __________ relevant marketplace would be affected adversely by the chal- lenged governmental action. Cf. Energy Transp. Group, Inc. v. ___ ___________________________ Maritime Admin., 956 F.2d 1206, 1215 (D.C. Cir. 1992) (finding _______________ that a disgruntled contract bidder, although generally engaged in _________ the fuel transportation business, failed to allege sufficient "competitive injury" where it could not presently, or within prescribed future period, perform the particular types of servic- es required by the contract at issue). The Supreme Court found "competitor standing" in the Camp cases based on an alleged ____ potential for heightened competition in a national marketplace. ________ Thus, arguably at least, the narrower the relevant marketplace, ________ as in Rental Housing (municipality) and here (state), the greater ______________ the likelihood that a plaintiff will experience future economic loss as a consequence of the competitive advantage bestowed on its direct competitor. In some "direct competitor" cases, future injury-in-fact is viewed as "obvious" since govern- ment action that removes or eases only the competitive burdens on the plaintiff's rivals plainly disadvantages the plaintiff's ______ competitive position in the relevant marketplace. However, "[w]here 'injury' and 'cause' are not obvious, the plaintiff must ___ _______ plead their existence in his complaint with a fair degree of specificity." Munoz-Mendoza, 711 F.2d at 425 (emphasis added). _____________ There can be no question but that out-of-state milk producers are in direct competition with Massachusetts milk 15 producers. At the very least, out-of-state producers have to defend their current 90% share of the Massachusetts milk market and may even elect to compete with Massachusetts producers for the remaining 10% market share.14 If, as alleged, see supra ___ _____ pp. 9-11, Massachusetts producers were to realize sufficient infusions of capital to increase their milk production and their Massachusetts market share, it is "obvious" that appellants would sustain direct economic harm commensurate with the diminution of their current market share. Even assuming, however, for discussion purposes, that the causal nexus between the challenged pricing order and appel- lants' alleged competitive injury is not sufficiently "obvious," we are not persuaded by the Commissioner's contention that the sequence of economic events projected in the second amended complaint is too conclusory, speculative or attenuated. See, ___ e.g., United Transp. Union v. Interstate Commerce Comm'n, 891 ____ _____________________ ___________________________ F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative . . . predictions of future events (especially future ______ actions by third parties) . . . .") (emphasis added), cert. _______ __ _____ _______ _____ denied, 497 U.S. 1024 (1990). In order to demonstrate "stand- ______ ing," "pleadings must be something more than an ingenious academ- ____________________ 14The Commissioner points out that appellants do not allege that they can increase their future milk production so as to displace the Massachusetts producers from their current 10% market share. Even assuming that this omission undermines their claimed "injury-in-fact" with respect to the 10% share, there is no requirement that a plaintiff plead multiple forms of future ________ injury-in-fact. 16 ic exercise in the conceivable"; a plaintiff may not simply assert "that he can imagine circumstances in which he could be affected by the agency's action." SCRAP, 412 U.S. at 689. The _____ more remote in time the alleged injury-in-fact, the less obvious the "concreteness of the controversy." Thus, where the complaint relies only on prospective harm, it "'must demonstrate a realis- tic danger of sustaining a direct injury.'" United Transp. _______________ Union, 891 F.2d at 913. On the other hand, "competitor standing" _____ cases necessarily turn on degrees of probability, see Mount ___________ _______ __ ___________ ___ _____ Wilson FM Broadcasters, Inc. v. Federal Communications Comm'n, _____________________________ ______________________________ 884 F.2d 1462, 1465 (D.C. Cir. 1989) ("If an[] agency's act creates 'a substantial probability' of an 'injury in fact,' the causation requirement of Article III is satisfied.") (quoting Warth, 422 U.S. at 504), a measurement "not easily susceptible to _____ concrete definitions or mechanical application," AVX, 962 F.2d at ___ 113. All predictions are conjectural to a degree. Somewhere along the spectrum of probability, between tomorrow's sunrise and "unadorned speculation," see, e.g., Diamond v. Charles, 476 U.S. ___ ____ _______ _______ 54, 66 (1986) (pediatrician's allegations of injury-in-fact based on assertion that aborted fetuses might otherwise have become fee-paying patients), lie appellants' allegations of "imminent" injury-in-fact based on the laws of economics. Economics is a cross between an art and a science, which is to say, both an imperfect art and an imperfect science. While the law of supply and demand may sometimes be suspended by unpredictable market- 17 place decisions, and even lesser fortuities like bovine obstina- cy, basic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predi- cated on actual market experience and probable market behavior. ________ Indeed, most "competitor standing" cases depend on such core economic postulates. See United Transp. Union, 891 F.2d at 913 ___ ____________________ (noting that in "garden variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic"); see also ___ ____ American Soc'y of Travel Agents, Inc. v. Blumenthal, 566 F.2d _______________________________________ __________ 145, 157 (D.C. Cir. 1977) ("[A]ll claims of competitive injury are to some extent speculative [and] predicated on the indepen- dent decisions of third parties, i.e. customers. However, economics is the science of predicting these economic decisions . . . .") (Bazelon, J., dissenting), cert. denied, 435 U.S. 947 _____ ______ (1978). In Rental Housing, we credited at face value an allega- ______________ tion that the plaintiff landlords, representing slightly more than one-third of the renters in the relevant housing market, would "lose tenants" to the HUD-subsidized project, even though their economic prediction plainly depended on the decisions of any number of independent parties inter alia, elderly tenants _____ ____ seeking suitable housing, local zoning and planning boards, other federal and state agencies, and lending institutions not to mention less predictable factors such as disasters, e.g., fire. ____ Two rational economic assumptions nonetheless combined to make it 18 sufficiently "probable" that the landlords would sustain "con- crete" future injury: by increasing the volume of available housing in a defined market, both consumer demand and prices were likely to fall. Similar economic principles impelled the Camp ____ triad decisions on "competitor standing." See also supra note ___ ____ _____ 13. The second amended complaint, much like that in Rental ______ Housing, is based on standard principles of "supply and demand" _______ routinely credited by courts in a variety of contexts. See, ___ e.g., Minneapolis Star & Tribune Co. v. Minnesota Comm'r of ____ ________________________________ ____________________ Revenue, 460 U.S. 575, 590 (1983) (price or sales tax increase _______ "presumably will cause a decrease in demand" for product) (citing Paul A. Samuelson, Economics 381-83, 389-90 (10th ed. 1976)); Competitive Enter. Inst. v. National Highway Traffic Safety _________________________ __________________________________ Admin., 901 F.2d 107, 125 (D.C. Cir. 1990) ("Since the demand for ______ a product is decreased as its price is increased . . . ."); Alcan _____ Sales, Div. of Alcan Aluminum Corp. v. United States, 693 F.2d _____________________________________ _____________ 1089, 1092 (Fed. Cir. 1982) (nonrefundable federal surcharges are likely to be more effective in decreasing demand for imported goods because importers are more likely "to pass along the cost of the surcharge through to consumers . . . ."), cert. denied, _____ ______ 461 U.S. 943 (1983). In the present case, the more industry- specific allegations such as Massachusetts dealers' preference for indigenous milk supplies are confirmed by the affidavit of Dr. Ronald Knutson, a national expert in dairy industry econom- ics, see supra pp. 9-11. We conclude, therefore, that rather ___ _____ 19 than "empirically unverifiable" conclusions, see Dartmouth ___ _________ Review, 889 F.2d at 16, the economic "facts" alleged in the ______ proposed second amended complaint set forth adequate grounds to demonstrate, at the pleading stage, a sufficient likelihood that __ ___ ________ _____ the challenged pricing order will result in reduced out-of-state milk sales to Massachusetts dealers at lower prices. Even assuming that out-of-state producers, as a class, __ _ _____ might be injured under appellants' forecasts, the Commissioner contends that these individual appellants failed to demonstrate __________ either injury-in-fact or that West Lynn Creamery will buy less than 100% of their milk production in the event Massachusetts production is increased in the future. Once again, we cannot agree. Like other Massachusetts dealers with whom it must compete, West Lynn's self-interest (in lower transportation costs and reduced perishability) will be served by purchasing milk from nearby producers, which at least in many, perhaps most, cases will be producers located in Massachusetts. In that eventuality, the out-of-state producers' current 97% share of West Lynn's milk business would decline. Nor is there anything in the appellate record to suggest that West Lynn has a non-economic motive to ____________ spare these individual appellants at the expense of other out-of- state producers. Furthermore, even if the alleged reductions in out-of-state milk purchases were minimal at the outset, appel- lants would no longer be able to command as high a premium for _______ their milk, because they would then have to compete with other out-of-state producers to supply a diminished share of West 20 Lynn's import needs. Finally, as out-of-state milk is displaced in the Massachusetts marketplace and "overflows" into interstate commerce, the federal blend price will deflate, lowering the "safety net" for all milk producers including appellants. For these reasons, we cannot agree with the conclusion that the federal "blend" price insulates appellants from all cognizable injury-in-fact, see supra pp. 8-9, or renders inconsequential all ___ _____ other alleged injury-in-fact (e.g., loss of premium paid out-of- ____ state producers prior to pricing order). Similarly, the Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts deal- ers) that their respective shares of the aggregate injury will be minimal. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be ques- tioned by nobody." SCRAP, 412 U.S. at 687; see also AVX, 962 _____ ___ ____ ___ F.2d at 113 ("While the requisite injury may be common to many, it may not be shared by all.") (citations omitted). Even if appellants' market "displacement" estimates were grossly exag- gerated, a relatively small economic loss even an "identifi- able trifle" is enough to confer standing, as it affords a constitutionally cognizable stake sufficient to ensure their vigorous prosecution of the litigation. See Rental Hous. Ass'n, ___ __________________ 548 F.2d at 389 (although plaintiffs collectively owned 7000 of 18,000 rental units in relevant marketplace, and HUD-subsidized 21 competitor would develop only 183 units, "the injury required for standing need not be substantial, it need only exist") (emphasis __ ____ ____ _____ added). Nor can the Commissioner sustain the dismissal on the ground that significant increases in Massachusetts milk produc- tion may be slow to materialize. The meaning of the term "immi- nent" depends on the particular circumstances, and in the highly competitive environment of the dairy industry, governmental actions often have intractable, long-term consequences. Particu- larly apt here is our earlier observation in Rental Housing: "it ______________ could hardly be thought that [State] action likely to cause harm cannot be challenged until it is too late." Rental Hous. Ass'n, __________________ 548 F.2d at 389. Although the "emergency" pricing order protect- ed Massachusetts milk producers from immediate erosion of their remaining 10% share of the Massachusetts milk market by out-of- state producers, an actual increase in Massachusetts milk produc- tion may take months or even years to materialize since it would depend upon long-term capital investments in dairy herd and farm expansions and infrastructure improvements. Once realized, however, the Massachusetts producers' newfound competitive edge would likely continue for an extended period. See, e.g., Sabine ___ ____ ______ River Auth. v. United States Dep't of Interior, 951 F.2d 669, 675 ___________ _______________________________ (5th Cir.) (plaintiff's challenge to government's acquisition of perpetual easement to wetlands area alleged sufficient non- speculative injury by projecting water shortage "some forty years in the future"), cert. denied, 113 S. Ct. 75 (1992). _____ ______ 22 We in no way suggest, of course, that the second amended complaint's portrayal of milk industry economics is beyond refutation either on summary judgment or at trial. See ___ SCRAP, 412 U.S. at 689 (where plaintiff alleges a "perceptible _____ harm," the defendant should move "for summary judgment on the _______ ________ standing issue and demonstrate[] to the District Court that the allegations were sham . . . .") (emphasis added); see also ___ ____ Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 506 (9th Cir. 1988) ____________________ ____ (holding that film distributor-exporters alleged sufficient injury-in-fact to challenge custom duties which allegedly "put[] their films at a competitive disadvantage in the international marketplace; "[a]lthough plaintiffs did not produce evidence that the payment of custom duties . . . caused decreased sales or profits, at the summary judgment stage, a plaintiff's allegations need not be proven but merely provable"); Citizens for Envtl. ____________________ Quality v. United States, 731 F. Supp. 970, 973 (D. Colo. 1989) _______ _____________ (noting that opposing party could refute "general rule in econom- ics [] that price decreases with increasing supply," by explain- ing "in highly technical terms that local timber markets depart from the general economic rule . . . .").15 As we noted in ____________________ 15We think appellants were entitled, at the pleading stage, __ ___ ________ _____ to presume that the milk industry would be subject to the basic economic laws at work in other competitive markets. See supra p. ___ _____ 9: The Supreme Court [in Camp] did not ... require plain- ____ tiffs to allege in their complaint facts sufficient to __ ______ __ _____ _________ refute every possible anomaly of the marketplace such as the existence of voluntary labor or ideologically committed consumers. The Court assumed the marketplace would function in a normal, predictable fashion, for to 23 Rental Housing, at this stage of appellants' litigation, "[w]e _______________ see no insurmountable obstacles to proof." Rental Hous. Ass'n, 548 __ ______________ _________ __ _____ ___________________ F.2d at 389 (emphasis added).16 III III CONCLUSION CONCLUSION __________ As the proposed second amended complaint was sufficient to survive the motion to dismiss based on lack of standing, the motion to amend was not futile and the order granting the motion to dismiss must be vacated. The judgment is vacated and the case is remanded for The judgment is vacated and the case is remanded for _______________________________________________________ ____________________ assume otherwise would be to foreclose the very possi- bility of ever satisfactorily alleging a competitive injury. American Soc'y, 566 F.2d at 158 (emphasis added). We nonetheless ________ _____ recognize, of course, as did the district court, that the milk industry is subject to federal marketing orders. Consequently, where such economic anomalies are material, they may be tested at summary judgment. 16We take no position respecting the merits of the Commerce Clause challenge, which implicates questions of interstate commerce "burdens" analytically distinct from the "injury-in- fact" determination that is central to standing. As noted above, the Supreme Court has decided to review the underlying Commerce Clause claim. See West Lynn Creamery, Inc. v. Commissioner of ___ _________________________ _______________ Dep't of Food and Agric., 415 Mass. 8, 611 N.E.2d 239, cert. __________________________ _____ granted, 62 U.S.L.W. 3244 (U.S. Oct. 4, 1993) (No. 93-141). _______ 24 further proceedings consistent with this opinion. further proceedings consistent with this opinion. ________________________________________________ 25